## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CLINT A. LORANCE,

              Petitioner,

v.

COMMANDANT, United States Disciplinary
Barracks, 1301 North Warehouse Road
Fort Leavenworth, Kansas 66027,

              Respondent.

Case No.   19-3232-JWL

## PETITION FOR A WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2241

Petitioner, by his attorneys JOSEPH HOLLANDER & CRAFT LLC and MAHER LEGAL SERVICES PC, respectfully requests the Court to award a writ of habeas corpus pursuant to 28 U.S.C. § 2241, release him from incarceration by Federal authorities, and reverse, vacate, and dismiss his convictions and sentence with prejudice.

John N. Maher *pro hac vice*
Illinois ARDC 6237599
District of Columbia 489313
Kevin Mikolashek
David Bolgiano
Don Brown
MAHER LEGAL SERVICES PC
7 East Main Street, Number 1053
St. Charles, Illinois 60174
Tel: (708) 468-8155
johnmaher@maherlegalservices.com

Christopher Joseph
Carrie Parker
Diane Bellquist
JOSEPH, HOLLANDER & CRAFT LLC
1508 SW Topeka Blvd.
Topeka, KS 66612-1887
(785) 234-3272 Main
(785) 234-3610 Fax
cjoseph@josephhollander.com

TABLE OF CONTENTS

I. THE PARTIES…………………………………………………………………….. 1

II. JURISDICTION………………………………………………………………….. 1

III. VENUE…………………………………………………………………………... 2

IV. SUMMARY OF LORANCE'S PETITION…………………………………….. 2

    A. Fifth Amendment Due Process…………………………………………. 3

    B. Sixth Amendment Ineffective Assistance of Counsel………………………………. 4

    C. Failure to Instruct on Affirmative Defenses……………………………………... 5

    D. Legal and Factual Insufficiency………………………………………... 5

V. ARTICLE III REVIEW OF ARTICLE I COURTS-MARTIAL………………………………. 6

VI. PROCEDURAL HISTORY………………………………………………... 11

VII. STATEMENT OF FACTS……………………………………………………. 13

    A. ZHARAY DISTRICT, KANDAHAR PROVINCE, AFGHANISTAN – JULY 2012……………… 13

    B. LORANCE'S BACKGROUND, EDUCATION, AND ARMY SERVICE…………………………... 16

    C. LORANCE ASSUMES COMMAND OF FIRST PLATOON ……………………………………… 17

    D. THE MOTORCYCLE ENGAGEMENT ON JULY 2, 2012……………………………………... 18

    E. THE SECOND ENGAGEMENT ON THE SAME JULY 2, 2012 COMBAT PATROL……………….... 20

    F. MURDER INVESTIGATION INTO CIVILIAN CASUALTIES OR "CIVCAS" …………………… 21

    G. CIVCAS OR ENEMY COMBATANT BOMBMAKERS?............................................... 24

    H. BIOMETRICS (FINGERPRINTS AND DNA) IN AFGHANISTAN……………………………… 25

    I. LORANCE RETAINS CIVILIAN CRIMINAL DEFENSE COUNSEL………………………………… 28

    K. PETITION FOR A NEW TRIAL……………………………………………………………... 30

    L. DIRECT APPEAL TO THE ARMY COURT OF CRIMINAL APPEALS…………………………… 33

M. THE ARMY COURT'S FINDINGS……………………………………………………34

N. THE COURT OF APPEALS FOR THE ARMED FORCES DENIES REVIEW……………………38

O. CHIEF JUDGE OF THE ARMY COURT PUBLICLY MISSTATES THE FINDINGS………………39

P. THE JUDGE ADVOCATE GENERAL REPEATS THE CHIEF JUDGE'S MISSTATEMENTS………44

Q. THE DEPARTMENT OF JUSTICE OFFICE OF THE PARDON ATTORNEY REFUSES TO PROCESS.45

VIII. GROUNDS FOR WHICH LORANCE SEEKS HABEAS CORPUS RELIEF……………47

A. GROUND ONE - FIFTH AMENDMENT DUE PROCESS……………………………………48

B. GROUND TWO - SIXTH AMENDMENT INEFFECTIVE ASSISTANCE OF COUNSEL………..61

C. GROUND THREE - JURY INSTRUCTIONS ON AFFIRMATIVE DEFENSES NOT GIVEN………65

D. GROUND FOUR – LEGAL AND FACTUAL INSUFFICIENCY………………………………66

IX. PRAYER FOR RELIEF……………………………………………………………67

VERIFICATION……………………………………………………………………69

CERTIFICATE OF SERVICE………………………………………………………69

ATTACHMENT A

ATTACHMENT B

## I. THE PARTIES

Petitioner Clint A. Lorance, formerly First Lieutenant Clint A. Lorance, 4th Brigade Combat Team, 82nd Airborne Division, United States Army (Lorance), is incarcerated by Federal officials in the United States Disciplinary Barracks (USDB) on Fort Leavenworth, Kansas, with Registration Number 93197. Respondent is the senior Federal officer responsible for the Military Corrections Complex in which Lorance is confined. The United States Army Litigation Division, United States Army Legal Services Agency, 9275 Gunston Road, Fort Belvoir, Virginia 22060, and The United States Attorney's Office for the District of Kansas, 444 S.E. Quincy, Suite 290, Topeka, Kansas 66683, represent Respondent.

## II. JURISDICTION

The Court possesses subject matter jurisdiction pursuant to 28 U.S.C. § 2241, habeas corpus for servicemembers. The Court is authorized to grant relief as law and justice require pursuant to 28 U.S.C. § 2243.

On December 19, 2017, the US Court of Appeals for the Armed Forces (CAAF) summarily denied Lorance's Petition for a Grant of Review. *United States v. Lorance*, ARMY 20130679, 2017 WL 2819756 (A. Ct. Crim. App. June 27, 2017), *review denied*, 77 M.J. 136 (App. Armed Forces 2017). Because the CAAF, in its discretion, denied Lorance's Petition for a Grant of Review, further direct appeal to the United States Supreme Court was precluded. Article 67, Uniform Code of Military Justice (UCMJ); 10 U.S.C. § 867 (2012); 28 U.S.C. § 1259. Pursuant to Rule for Courts-Martial (RCM) 1209, direct appeal is final where a petition for review is denied or otherwise rejected by the CAAF.[1]

---

[1] The first level of appeal in the military process involves the Court of Criminal Appeals for the servicemember's branch, for example, the Army Court of Criminal Appeals (Army Court). 10 U.S.C. § 866 (2012). This court consists of uniformed Judge Advocates appointed by The Judge Advocate General. *Id.* Review at the first level is mandatory for sentences involving death, confinement in excess of one year, dismissal of an officer, or a punitive discharge (bad

III. <u>VENUE</u>

Because Lorance is confined by Federal officials in Leavenworth, Kansas, venue is proper

in this district pursuant to 28 U.S.C. § 2241.

IV. <u>SUMMARY OF LORANCE'S PETITION</u>

This petition challenges the validity of Lorance's two Federal convictions for murder, one

conviction for attempted murder, and five lesser offenses arising out of a combat action during an

Infantry patrol in a hostile fire zone in Kandahar, Afghanistan. At the heart of this petition is the

actions a young Army leader took to protect his Soldiers in combat, for which he was prosecuted,

convicted, and sentenced to 19 years in prison. This petition questions whether the Article I

military courts gave adequate consideration to the constitutional issues involved, applied proper

legal standards, and truly fully and fairly considered Lorance's claims in the face of enormous

public and political pressure on the military to address the specter of civilian casualties on the

battlefield.

On July 2, 2012, during a combat patrol during the height of the fighting season where the

Platoon recently lost four members to enemy attacks, one of Lorance's paratroopers in the 82nd

Airborne Division saw three Afghan men riding on a single motorcycle at an excessive rate of

speed towards the Platoon's single file route of march through a minefield. The paratrooper fired

his rifle, as he later testified, in compliance with the rules of engagement (ROE) justifying deadly

force in self-defense and defense of others. But he missed. In only his third day as the new Platoon

Leader, Lorance gave a radio order to other members of the Platoon to fire on the motorcycle. Two

_____

conduct discharge or dishonorable discharge) for an enlisted servicemember where the right to appellate review has
not been waived. *Id*. The second level of appeal involves the Court of Appeals for the Armed Forces (CAAF),
consisting of five civilian judges appointed by the President. 10 U.S.C. § 867. Review at the second level is
discretionary. 10 U.S.C. § 867 (2012). If the CAAF denies review, the military appellate process is concluded and
access to the United States Supreme Court is not available. *Id*. If the CAAF grants review, appeal of its decision can
be pursued before the United States Supreme Court. 28 U.S.C. § 1259 (2012).

riders were killed. One escaped unharmed. Lorance's convictions and sentence can be largely traced to this engagement.

Direct appellate review is complete. Lorance now brings four constitutional grounds for relief in his first petition for a writ of habeas corpus: A) Fifth Amendment Due Process; B) Sixth Amendment Ineffective Assistance of Defense Counsel; C) Failure of the Trial Judge to Issue Instructions on Affirmative Defenses; and D) Legally and Factually Insufficient Evidence.

**A. <u>Fifth Amendment Due Process</u>**. Lorance was deprived of his Fifth Amendment due process rights because the prosecution failed to disclose material exculpatory and mitigating evidence, including fingerprint and DNA evidence that Afghan men were not civilian casualties as the prosecution told the jury, but in fact terrorist bombmakers who intended to kill American Soldiers. The prosecution also failed to disclose a Significant Activity Report completed one month after the shooting that concluded Lorance's Platoon was being scouted for an impending attack or ambush and that at least one insurgent was killed - while the prosecution told the jury only civilian casualties occurred. The Army's undisclosed report gives credence to Lorance's split-second judgment that the Platoon was in danger. The prosecution likewise failed to produce the final investigative report issued by the U.S. Army Criminal Investigation Command (CID) agents who investigated the case.

The military courts failed to conduct a full and fair review of Lorance's convictions. The Army Court failed to even address in its opinion that Lorance was acquitted of a Charge that was the foundation of the prosecution's main theories of murder. Though the prosecution sought to convince the jury that Lorance had changed the ROE and ordered his Soldiers to fire on all motorcycles, the jury acquitted Lorance of this Charge. Omitting the acquittal, the Army Court instead chose to include facts suggesting that Lorance changed the ROE even though the jury

found him not guilty, and based its affirmance in some measure on that faulty and constitutionally incorrect premise.

Further, the military courts, in rejecting Lorance's argument that the fingerprint and DNA evidence should have been disclosed, ignored at least the following five points:

(1) that the Afghan men were not civilian casualties as the prosecution told the jury, but were actually combatant bombmakers who intended to harm or kill American Soldiers by secretly planting explosives in the ground and who could be lawfully targeted by American forces;

(2) that the fingerprint and DNA evidence was necessary to present a legal defense: that Lorance was duty-bound pursuant to orders, self-defense, defense of others, duress, mistake or justification to order his Soldiers to fire their weapons to protect themselves;

(3) that if the fingerprint and DNA evidence revealed the Afghan men to be known bombmakers, this would have been mitigating and extenuating evidence that would have impacted the jury's findings and any sentence imposed;

(4) that the fingerprint and DNA evidence was reliable and trustworthy, as recognized and acknowledged by General Petraeus, the Center for Army Lessons Learned, THE COMMANDER'S GUIDE TO BIOMETRICS IN AFGHANISTAN – OBSERVATIONS, INSIGHTS, AND LESSONS (No. 11-25, 2011), and the billions of dollars the US Congress invested in the capability; and

(5) that the evidence was readily available on databases used daily by American forces in Afghanistan.

**B. Sixth Amendment Ineffective Assistance of Counsel**. The military courts found defense counsel's performance reasonable even though Lorance's retained civilian attorney: did not interview any American or Afghan witness, to include the Afghan attempted murder victim and an two Afghan material eyewitnesses; arrived the night before this fully contested double

4

murder and attempted murder jury trial where Lorance faced a potential life sentence from another trial in a different state; did not reveal to the jury that witnesses were given immunity and ordered to cooperate in the case against Lorance; did not interview the previous Platoon Leader who wrote that he would never allow a motorcycle to get near his Platoon; and failed to secure from the prosecution fingerprint and DNA evidence that the purported victims were not civilian casualties as the prosecution claimed, but terrorist bombmakers. The appellate decision in *Lorance* does not address, head on, counsel's insufficient pretrial investigation which actually and materially prejudiced Lorance's substantial trial rights.

C. **Failure to Instruct on Affirmative Defenses**. The military courts declined to discuss Lorance's claim that Due Process went unobserved again when the trial judge failed to instruct the jury on affirmative defenses that were raised and supported by the evidence presented at trial, such as justification, obedience to orders, mistake of fact, or duress.

D. **Legal and Factual Insufficiency**. The military courts did not address the seemingly pivotal question Lorance presented—a point that reasonably stood to require a new trial or a complete reversal: whether an order to fire based on ROE-compliance at targets that were insurgent bombmakers can be murder or attempted murder in a combat zone. Nor did the Army Court consider that even if the Afghan victims were truly innocent civilians, that they were casualties of war under applicable international law categorized as "collateral damage."

Lorance urged the military courts that the evidence was insufficient to sustain his convictions, but the military courts declined to address his claims. These points demonstrate that Lorance's New Trial Petition and separate appeal were neither fully nor fairly considered and that his Fifth and Sixth Amendment trial protections were inadequately safeguarded by the Article I military courts.

## V. ARTICLE III REVIEW OF ARTICLE I COURTS-MARTIAL

This Court is authorized to reach and determine the merits of Lorance's constitutional claims. Federal statutes, 28 U.S.C. § 2241 and 28 U.S.C. § 2243, empower this Court to entertain a military prisoner's habeas claims and to grant relief as law and justice require. In *Burns v. Wilson*, 346 U.S. 137 (1953), the Supreme Court made clear that civilian habeas review of military decisions is altogether proper when constitutional deprivations resulted in unfair proceedings or unreliable results, and consequently unjust confinement. In *Burns*, the Supreme Court observed:

> The constitutional guarantee of due process is meaningful enough, and sufficiently adaptable, to protect soldiers – as well as civilians – from the crude injustices of a trial so conducted that it becomes bent on fixing guilt by dispending with rudimentary fairness rather than finding truth through adherence to those basic guarantees which have long been recognized and honored by the military courts as well as the civilian courts.

*Burns*, 346 U.S. at 142.

Although determinations made in military proceedings are final and binding on all courts, 10 U.S.C. § 876 (2012), the district courts' jurisdiction over a petition for habeas from a military prisoner is not displaced. *Schlesinger v. Councilman*, 420 U.S. 738, 745 (1975) (taking note of the binding nature of court-martial decisions on civil courts, but also recognizing the civil courts' jurisdiction to review habeas petitions stemming from court-martial convictions); *Gusik v. Schilder,* 340 U.S. 128, 132 (1950) (describing the "terminal point" of court-martial proceedings where civil habeas corpus review may begin). Where constitutional protections were not observed at the trial court level or during direct appeal, the Federal habeas court is empowered to address those claims. *Monk v. Zelez*, 901 F.2d 885, 893 (10th Cir. 1990) ("The writ of habeas corpus shall issue immediately."); *Burns*, 346 U.S. at 139 (explaining that Federal civil courts have jurisdiction over habeas petitions alleging the proceedings "denied them basic rights guaranteed by the

Constitution"); *Dodson v. Zelez*, 917 F.2d 1250, 1252 (10th Cir. 1990) (federal jurisdiction to review court-martial proceedings requires "[t]he asserted error . . . be of substantial constitutional dimension."); *Dixon v. United States*, 237 F.2d 509, 510 (10th Cir. 1956) ("in military habeas corpus the civil courts have jurisdiction to determine whether the accused was denied any basic right guaranteed to him by the Constitution").

The Tenth Circuit uses a four-part test to determine whether a Federal habeas court should reach the merits of a constitutional challenge to a court-martial conviction: (1) whether the asserted error is of substantial constitutional dimension; (2) whether the issue is one of law rather than one of disputed fact previously determined by a military tribunal; (3) whether military considerations warrant different treatment of the constitutional claim(s); and (4) whether the military courts gave adequate consideration to the issues involved and applied proper legal standards. *Mendrano v. Smith,* 797 F. 2d 1538, 1542 n.6 (10th Cir. 1986) ("our cases establish that we have the power to review constitutional issues in military cases where appropriate."); *Monk*, 901 F.2d at 888 (constitutional claim is subject to our further review because it is both "substantial and largely free of factual questions."). In *Monk*, the Tenth Circuit favorably cited *Calley v. Callaway*, 519 F.2d 184, 199-203 (5th Cir. 1975), *cert. denied*, 425 U.S. 911 (1976). *Id*. "Consideration by the military of such [an issue] will not preclude judicial review for the military must accord to its personnel the protections of basic constitutional rights essential to a fair trial and the guarantee of due process of law." *Calley*, 519 F.2d at 203.

This Court has discretion to determine if Lorance's claims were fully and fairly considered by the military, reach the merits, and award the writ. In *Dodson,* 917 F.2d at 1252, the Court noted that a district judge has a "large amount of discretion" when determining whether a military habeas petitioner's claims were fully and fairly considered on direct appeal: "[w]e recognize that these

factors still place a large amount of discretion in the hands of the federal courts." Turning to the

definition of full and fair consideration, the Tenth Circuit in *Watson* explained that "full and fair"

consideration has not been defined precisely, but leaves the Article III trial judge with the

discretion to reach the merits and determine if constitutional protections were correctly considered

and applied:

> Although there has been inconsistency among the circuits on the
> proper amount of deference due the military courts and the
> interpretation and weight to be given the "full and fair
> consideration" standard of *Burns*, this circuit has consistently
> granted broad deference to the military in civilian collateral review
> of court-martial convictions. Although we have applied the "full and
> fair consideration" standard, we have never attempted to define it
> precisely. Rather, we have often recited the standard and then
> considered or refused to consider the merits of a given claim, with
> minimal discussion of what the military courts actually did.

*Watson*, 782 F.2d at 144 (internal citations omitted).

Consequently, the applicable federal habeas statutes, 28 U.S.C. § 2241 and 28 U.S.C. §

2243, and the Supreme Court and Tenth Circuit precedents in *Burns*, *Watson, Mendrano*, *Monk*,

and *Dodson*, *supra*, authorize Article III courts to reach the merits of constitutional habeas

challenges arising from Article I courts-martial and issue the writ -- even when the issue was

briefed and decided by the military before arriving in Federal court.

Put another way, none of the applicable legal authorities requires the Federal civilian

judiciary to follow an Article I court's constitutional determinations lock-step. To the

contrary, *Burns* (on which the Tenth Circuit's decision in *Watson* is based) specifically states that

review is narrow, not foreclosed, and Article III review is appropriate where "military review was

legally inadequate to resolve the claims which they have urged upon the civil courts." *Burns*, 346

U.S. at 146.

This is especially so where, like here, the military's "full and fair consideration" is fatally flawed. Military review cannot be "full" where pivotal evidence was not evaluated and material evidence was misstated. Nor can review be "fair" where Supreme Court precedents interpreting the Fifth and Sixth Amendments in a Federal criminal trial were misapplied. As the Tenth Circuit observed in *Lips v. Commandant*, 997 F.2d 808, 811 (10th Cir. 1993), "[o]nly when the military has not given a petitioner's claims full and fair consideration does the scope of review by the federal civil court expand."

Examples where the court correctly determined that the military had not given a petitioner's claims full and fair consideration, and thus reviewed the merits of a military habeas petitioner's claims in the Tenth Circuit include: *Mendrano*, 797 F.2d at 1541-42 ("full review of petitioner's claim is especially appropriate here" in context of Due Process and Sixth Amendment right to jury trial); *Wallis v. O'Kier*, 491 F.2d 1323, 1325 (10th Cir.), *cert. denied*, 419 U.S. 901, (1974) ("Wallis asserted in his habeas corpus petition that he was being deprived of his liberty in violation of a right guaranteed to him by the United States Constitution. Where such a constitutional right is asserted and where it is claimed that the petitioner for the Great Writ is in custody by reason of such deprivation, the constitutional courts of the United States have the power and are under the duty to make inquiry."); *Kennedy v. Commandant, U.S. Disciplinary*, 377 F.2d 339, 342 (10th Cir. 1967) ("We believe it is the duty of this Court to determine if the military procedure for providing assistance to those brought before a special court-martial is violative of the fundamental rights secured to all by the United States Constitution."); and *Monk*, 901 F.2d at 888 (reviewing reasonable doubt instruction and granting petitioner's request for a writ).

That this Court may determine the merits of Lorance's claims is further shown by looking to the purpose of the military justice system and the basis for Article III deference to Article I

courts-martial. To be sure, Article III courts ought to defer to the military courts insofar as "[t]he purpose of military law is to promote justice, to assist in maintaining good order and discipline in the armed forces, to promote efficiency and effectiveness in the military establishment, and, thereby, strengthen the national security of the United States." Part I-1, Manual for Courts-Martial, United States (2016 Ed.); *see also Burns*, 346 U.S. at 141 (noting that "the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty," and that federal courts have "had no role in [military law] development"). The military courts are surely better equipped than the civilian courts in their analysis of the Manual for Courts-Martial or matters impacting good order and discipline.

But this is not the case where the habeas issues involve fundamental constitutional guarantees applicable to all citizens. Whether a prosecutor and his investigators complied with the Fifth Amendment's Due Process obligations, or a defense counsel fulfilled his duties under the Sixth Amendment's standard for effective assistance of counsel at trial, or whether a military appellate court conducted a meaningful review to ensure constitutional safeguards were observed, has nothing to do with the unique nature of the military as a distinct society--the basis for civilian judicial deference. The Fifth and Sixth Amendments apply equally in both the military and civilian settings, unaffected by the military's unique position in American society. Indeed, it is incumbent upon the district court to examine whether the constitutional rulings of a military court conform to prevailing Supreme Court standards. *Kauffman v. Secretary of the Air Force*, 415 F.2d 991, 997 (9th Cir. 1969).

Accordingly, there is no reason to defer to the military courts where, as here, the habeas claims involve application of the Constitution during trial and appeal. Congress and the Supreme Court have defined Article III review of military convictions to be appropriate in situations where

military courts denied a servicemember "basic rights guaranteed by the Constitution." *Burns*, 346 U.S. at 139. Here, each of Lorance's five habeas grounds involve constitutional rulings of military courts which do not conform to prevailing Supreme Court standards and were thus neither fully nor fairly reviewed.

## VI. PROCEDURAL HISTORY

On August 1, 2013, a jury of 82nd Airborne Division commissioned officers sitting as a general court-martial on Fort Bragg, North Carolina convicted Lorance, contrary to his pleas, of one specification of attempted murder, two specifications of unpremeditated murder of "male[s] of apparent Afghan descent," and five specifications of conduct prejudicial to good order and discipline or of a nature to bring discredit upon the armed forces in violation of Articles 80, 118, and 134 UCMJ; 10 U.S.C. §§ 880, 918, and 934 (2012). *United States v. Lorance*, Army 20130679.

Approximately one year prior, during a combat patrol in the Afghanistan combat zone, one of Lorance's paratroopers saw three military-aged males riding on a single motorcycle at an excessive rate of speed toward the Platoon's single-file route of march behind a minesweeper through a mine field. Aware of enemy tactics of using vehicles as suicide-borne improvised explosive devices (IED) or a shooting platform, a Soldier in Lorance's Platoon believed the motorcyclists posed a threat and fired his rifle at them, but missed. Lorance, as Platoon Leader, radioed other paratroopers in the Platoon to fire on the motorcycle. Within seconds, the Platoon shot and killed two riders. The third rider escaped unharmed and un-detained.

Despite the Charges of which Lorance was convicted, the jury acquitted him on one specification. Lorance had been accused of telling his Platoon members before the combat patrol that left the Afghans dead that the ROE had changed. Specifically, Lorance was accused of telling his Platoon that the paratroopers could use deadly force against motorcyclists on sight, in violation

11

of Article 107, UCMJ; 10 U.S.C. § 907 (2012). Despite the prosecution's contentions, the jury found Lorance not guilty of this offense.

The jury sentenced Lorance to confinement for 20 years, forfeiture of all pay and allowances, and a dismissal from the Army, which is the equivalent of a Dishonorable Discharge for commissioned officers. Army authorities subsequently approved 19 years confinement, which Lorance continues to serve.

 On June 27, 2017, the Army Court of Criminal Appeals (Army Court) denied Lorance's Petition for a New Trial brought pursuant to Article 73, UCMJ; 10 U.S.C. § 873 (2012). On the same day, the Army Court denied Lorance's request for a hearing. The Army Court then denied Lorance's overall appeal, which contained six assignments of error brought separately from the New Trial Petition pursuant to Article 66, UCMJ; 10 USC § 866 (2012). *United States v. First Lieutenant Clint A. Lorance*, ARMY 20130679, 2017 WL 2819756 (A. Ct. Crim. App. June 27, 2017).

On August 28, 2017, Lorance filed a Petition for a Grant of Review with the CAAF pursuant to Article 67, UCMJ; 10 U.S.C. § 867 (2012). On October 10, 2017, dozens of senior retired military veterans of small unit combat actions like Lorance's moved the CAAF to offer their Amicus Curiae Brief. On December 12, 2017, the CAAF summarily denied Amicus Curiae's motion. On December 19, 2017, the CAAF summarily denied Lorance's Petition for a Grant of Review. *United States v. Lorance*, ARMY 20130679, 2017 WL 2819756 (A. Ct. Crim. App. June 27, 2017), *review denied*, 77 M.J. 136 (U.S. Ct. App. Armed Forces 2017).

A Petition for a Writ of Certiorari to the United States Supreme Court was not available to Lorance because the CAAF declined to review his case. *See* 28 U.S.C. § 1259. With his direct appeals exhausted, Lorance now brings this first petition for habeas corpus challenging the validity

of his convictions and sentence on constitutional grounds that were neither fully nor fairly reviewed by Article I legislative courts.

## VII. <u>STATEMENT OF FACTS</u>

### A. <u>ZHARAY DISTRICT, KANDAHAR PROVINCE, AFGHANISTAN – JULY 2012</u>

First Platoon occupied an outpost called Strong Point Payenzai (Strong Point) overlooking the rural village of Sarenzai in the Zharay district of Kandahar province, Afghanistan. (R. at 242). Kandahar is known as the "ancestral home of the Taliban."[2]

 The village of Sarenzai sat to the west and the north of the Strong Point, which was in the shape of a triangle, or, as Lorance called it, a "Dorito." (R. at 305). It had three look-out towers, one entry-control-point, and was surrounded by razor wire and heavy sand-filled barriers for protection. (R. at Allied Papers). Enemy contact there and in the village was frequent and the fighting treacherous. (R. at 509) ("Every time we went in the village of Sarenzai we had been attacked").

To get to the village of Sarenzai from their Strong Point, paratroopers first headed west, then crossed a dirt road after climbing up and down rows of grape berms that were so high they often precluded the paratroopers from seeing over the individual berms. (R. at 730). The location is, quite literally, a minefield—compelling patrols to walk in tight, single-file formation behind a Soldier out front carrying a hand-held minesweeper. (R. at 660). This severely limited the ability for a paratrooper to maneuver on foot in the event of being attacked or fired upon for fear of stepping on a mine or detonating an IED buried in the dirt. After heading west from the Strong Point in single file, a sharp right turn north brought patrols to the eastern edge of the village, which was essentially a one-lane dirt road with mud structures on each side running east and west.

---

[2] Carlota Gall, *In the Taliban's Heartland, US and Afghan Forces Dig In*, New York Times, February 4, 2011 *available at* https://www.nytimes.com/2011/02/05/world/asia/05afghanistan.html.

In the months leading up to the gun fire giving rise to Lorance's trial, the enemy attacked nearly every patrol from the Platoon. (R. at 509).  In fact, in the weeks before Lorance became the Platoon Leader, the Platoon had sustained four debilitating casualties. Because the Platoon had been hit so hard by the enemy, they had just returned from several days of downtime and rehabilitation at another base to the rear of the front lines. There, they received combat stress medical attention due to the high number of recent casualties. (R. 165, 289, 300).

During combat patrols over the same field that Lorance would lead the Platoon from the Strong Point to the village and back), the former Platoon Leader, First Lieutenant Dominic Latino, sustained peppering shrapnel wounds to his abdomen, limbs, eyes, and face when a hidden IED exploded and blew up in his face. (R. Allied Papers, CID Agent's Activity Summary, Vol. III). Latino was medically evacuated from the field, and Lorance replaced him as the new Platoon Leader.

Private First Class Walley, another Platoon member, was severely maimed in a bomb blast, losing his right arm below the elbow, right leg below the knee, and incurred serious soft tissue damage to his left leg. *Id*. Private First Class Kerner was hit in the thighs and buttocks, while Specialist (SPC) Hanes was shot in the throat. *Id*. The gunshot to SPC Hanes fractured vertebrae in his spine, broke his rib, and collapsed his lung. He was paralyzed from the waist down and died in 2015 from his wounds. *Id*.

Mindful of these casualties, Lorance pledged that he wanted nobody else to be killed or wounded while he was Platoon Leader. (R. 300; 503). That was his solemn duty. But fulfilling that pledge would be difficult in the violent Taliban area where death and maiming were suddenly delivered by a shadowy enemy who wore the same clothing as civilians.

The rules of engagement, or ROE, are the legal steps Soldiers must follow in order to use deadly force in Afghanistan. The ROE allows for shooting those forces declared as hostile (which were very few at that time) and when acting in self-defense (where the target's status is irrelevant). By law, every killing in combat is presumed lawful because it is justified. RCM 916(c), Discussion (stating plainly that "killing an enemy combatant in battle is justified"). One example would be where senior commanders know that certain individuals are enemy combatants because they left their fingerprints or DNA on IED components. Commanders could then affirmatively and deliberately target that individual for a drone strike or a kill mission. Another example, more common to junior Soldiers on patrol, is where military-aged males display hostile intent or a hostile act (*e.g.*, raising a rifle toward an American, lifting a hand grenade toward an American, driving a vehicle at an excessive rate of speed toward an American unit) may justify a Soldier's use of his inherent right of self-defense or defense of others to fire his rifle and use deadly force to protect himself and his unit.

Accordingly, positively-identified terrorists or known bombmakers can be affirmatively targeted by command order, yet a Soldier does not have to seek and secure permission to use his inherent right of self-defense where circumstances reasonably show hostile intent or a hostile act. However, the ROE does not authorize using deadly force against civilians who are either true non-combatants or not presenting an imminent threat of death or grievous bodily injury.

Enemy insurgents used the American ROE to their advantage and often struck from the cover of planned anonymity, many disguised as local farmers, and then disappeared into the population. (R. at 225) ("the forces, obviously, that we were engaging in Afghanistan were called 'maybe a guerilla force' in terms that they could blend straight into the -- the indigenous population."").

These stealth tactics made distinguishing terrorists, insurgents, the Taliban, and enemy bombmakers from civilians quite a challenge, especially in a compressed timeframe where the wrong decision, or a tardy decision, meant life or death. It was made even harder when one's mission as Platoon Leader included protecting one's paratroopers while simultaneously accomplishing the objectives of showing coalition presence and denying the enemy sanctuary.

B. LORANCE'S BACKGROUND, EDUCATION, AND ARMY SERVICE

On July 1, 2012, Lorance was 28 years old. (R. at Officer Record Brief). A native Oklahoman, he comes from a patriotic family where military and public service is respected. From an early age, Lorance wanted to be a Soldier. He enlisted after high school, graduated from Basic Training, and served in the Military Police Corps in Iraq, South Korea, Georgia, North Carolina, Alaska, and Texas. *Id*. Based largely on his non-commissioned officer evaluation reports, which praised his dedication, selflessness, devotion, and aptitude, the Army selected him for the prestigious officer education and commissioning "Green to Gold" program, where deserving enlisted Soldiers with leadership and aptitude attend college full-time at the Army's expense, while still on active duty. While in college full-time, Green to Gold participants must also complete the Reserve Officers' Training Corps (ROTC) program of study. *Id*. By all accounts, Lorance was an excellent ROTC cadet while completing undergraduate work in Texas.

Upon graduation, the Army commissioned Lorance into the Infantry, he completed the Infantry Basic Officer Leader Course, became air assault qualified (rappelling out of helicopters) and a paratrooper (parachuting from aircraft). His enlisted and officer performance records, spanning a decade, were exemplary. *Id*. They contain dozens of certificates of achievement, personal awards, and decorations. Captain Zachary Pierce, who supervised Lorance, writes as follows:

> As a lieutenant, as a paratrooper, as a Soldier, I think it's difficult to find an equal. He's unparalleled in his adherence to standards and true – the right way of doing things. He doesn't cut corners. Truly competent, truly trustworthy. Responsible and willing to take criticism well. Develops himself. Learns from his experiences, from his failures and successes. As a person, he is one of the kindest and gentlest people I've met particularly in the Army. It's uncommon to have someone so truly kind in this organization. It's difficult to ever, I'd don't think I've ever and could ever envision any kind of malice or ill-intent in Clint's heart.

(R. 936). Expressing what was in his heart, Lorance wrote that his main goal as Platoon Leader was "to bring my men home safely," and that he would have given his life and freedom for their safety. (R. Post-trial Matters). Attachment A is a digital image of Lorance at the time of the trial.

### C. LORANCE ASSUMES COMMAND OF FIRST PLATOON

As part of his preparation to lead First Platoon in combat, Lorance talked with his superior officer, Captain Swanson, about the historical violence in the area, the tactics the enemy used, and received intelligence reports and information about Taliban and insurgent fighter activity near the village. Captain Swanson stated that Clint "was highly recommended, seemed motivated and proactive and indicated that he understood my guidance." (R. App. Ex. IV, 46).

On July 1, 2012, Lorance led his first combat patrol. He had been with the Platoon for 24 hours and had the difficult job of replacing a beloved Platoon Leader who had been wounded in action. The Platoon received small arms fire from "historical enemy firing positions" while returning to their Strong Point, confirming intelligence reports, which stated that the enemy was active in the area and involved in intimidating the local population. (R. Allied Papers, CID Agent's Activity Summary, Vol. III).

At that time in the Platoon's deployment rotation, the record reflects that they had inflicted approximately 50 enemy killed-in-action. The local population informed International Security Assistance Force (ISAF) personnel that they do not go up Route Chilliwack (the road on which

the three riders approached) because it was a "known Taliban safe haven, bed-down location, and staging point for attacks against US personnel." (R. Ex. 50). First Platoon had been "attacked by grenades and on multiple occasions ha[d] discovered Home Made Explosives (HME), and IED factories." *Id*.

The next day, July 2, 2012, Lorance led his second (and, ultimately, his final) Infantry patrol with the mission to deny enemy sanctuary and to demonstrate coalition presence. Sergeant First Class (SFC) Ayres, the Platoon Sergeant (senior enlisted leader) explained, "every time we'd go in there [village] we got shot at." (R. 517). "Every time we moved in, in any type of village we pretty much constantly observed enemy forces monitoring our movement, maneuvering on us, getting into their fighting positions ready to fight." (R. 510).

This morning, July 2, 2012, Lorance's Platoon, as per usual, patrolled in a single file route of march behind a minesweeper, up and down 6-8-foot grape berms, and across the road before turning north to enter the village. (R. 364). On this morning, the Afghan National Army (ANA) was "in the lead," (R. 363), meaning that several ANA soldiers were at the front of the single-file squad, with the American paratroopers following behind the Afghans, as part of a "combined" patrol.

D. THE MOTORCYCLE ENGAGEMENT ON JULY 2, 2012

Private First Class Skelton (Skelton), a former civilian police officer before he joined the Army, was perched atop a grape berm and saw three military-aged males riding on a single red motorcycle coming directly at the Platoon from a known enemy avenue of approach (Route Chilliwack) at an excessive rate of speed. (R. 365, 452, 460, 534-35, 688).

Skelton testified at trial that he concluded the three riders on a single motorcycle were a deadly threat because they could blow themselves up among the Platoon, throw grenades and speed away, or conduct a "drive-by" shooting:

> A. (Skelton) Knowing the area that it was coming from, the first thought I had was it could be a drive-by shooting; it could be a drive-by grenade throw; it could be a vehicle borne IED.
>
> Q. So "it could be" as in something to look out for?
>
> A. (Skelton) These are potential dangers.
>
> Q. Did you perceive any actual threat?
>
> A. (Skelton) The vehicle was traveling fast down Route Chilliwack.
>
> Q. Okay, roughly how fast was it going?
>
> A. (Skelton) My estimates for the speed, between 30, 35, 40 miles an hour, ----
>
> Q. Okay.

(R. at 537).

Based on his threat assessment, Skelton fired his rife at the motorcycle, but missed. (R. at 366). Skelton testified that he fired to protect his unit and himself in compliance with the ROE, which authorized self-defense and unit self-defense:

> Q. It was your obligation, as you saw it, to say to Soldiers that the motorcycle was possibly threatening because of the potential threat it represented, correct?
>
> A. (Skelton) We have the right to protect ANA and coalition forces, yes.
>
> Q. And at the time that you fired, you believed that's what you were doing; you were protecting friendly forces, both American and ANA?
>
> A. (Skelton) Based on -- based on ROE (rules of engagement) and my quick threat analysis of what could happen, yes.

19

> Q. Yes. So this I'll ask you, okay. Based on what you had available to you, you saw this as a threat and you felt an obligation as an American Soldier to protect friendly forces, American and ANA, correct?
>
> A. (Skelton) Yes.

(R. at 585-586).

Responsible for his Platoon's safety, Lorance issued a radio order to a gun truck (*i.e.*, an armored vehicle equipped with an M240 machine gun often used to escort convoys) he had previously placed in an overwatch to protect the Platoon from this very type of anticipated threat to fire on the motorcycle. From the turret of the gun truck, a machine gunner shot and killed two of the riders. The third escaped unharmed and un-detained. Five witnesses testified that the fatal shots were fired "three seconds," "a few seconds," "five seconds," "10 seconds" and "20 – 30," after Skelton fired the initial volley at the three riders. (R. at 384; 497; 501; 655; 658; 675).

Lorance, standing in the bottom of the row between the grape berms where he personally could not see the motorcycle and below Skelton who was up on top of the grape berm, never fired his rifle. Instead, Lorance was working his radio which, as Platoon Leader, he was expected to do.

E. THE SECOND ENGAGEMENT ON THE SAME JULY 2, 2012 COMBAT PATROL

Shortly after Lorance's Platoon engaged the three riders, the lead element continued its patrol and pushed through the village. Staff Sergeant Herrmann (Herrmann), PFC Carson (Carson), and their "gun crew" made it to the roof of the westernmost mud structure at the farthest edge of the village. From their perch on the roof, they observed additional military-aged-males bobbing and weaving among the grape berms to the north, gesturing, pointing at the paratroopers, and talking on radios. (R. 512-514). As the military-aged-males "suspiciously" approached from the north, SPC Haggard exclaimed, "get down, we are about to get shot at." (R. Allied Papers, Agent's

Activity Summary, Vol. III).

Thereafter, without coordinating with Lorance, Herrmann and Carson opened fire, killing two and wounding a third. (R. 510-11). Intelligence confirmed that the local-nationals Hermann and Carson shot, killed, and wounded were hostile to Americans. *Id* (near real-time technology intercepted local-national radio traffic which was translated roughly as "we have to do something to the Americans"). The wounded male was shot in the arm, he was detained, and tested positive for homemade explosive residue (HME) on his hands, indicative of recent bombmaking activity. He was identified by Army CID authorities as Mohammad Rahim, was brought to the Kandahar American hospital, treated, and released. (R. Allied Papers, CID Agent's Activity Summary, Vol. III). Then, another lone rider approached the American element from the north on the western edge of the village. He was detained, and he too tested positive for HME. *Id*. Unclear in the record, he was released.

### F. MURDER INVESTIGATION INTO CIVILIAN CASUALTIES OR "CIVCAS"

While patrolling back to their Strong Point over the same route on which they came into the village, a paratrooper described one of the deceased motorcycle riders as a "village elder," which triggered reporting of potential civilian casualties, or "CIVCAS" to higher levels in the chain of command. (R. at 315; 631).

Three months earlier, in March 2012 in the neighboring District of Panjwai, also in Kandahar Province and next door to the Zharay District, a U.S. servicemember was alleged to have killed sixteen civilians at night in their homes,. That incident received world-wide media and political attention, including outcry from the Government of the Islamic Republic of Afghanistan (GIRoA) to the United States and Coalition nations.

After the July 2, 2012, gun fights, the members of the Platoon (except for Lorance, who was given an order not to have any contact whatsoever with the paratroopers of First Platoon) were taken that day from their Strong Point and ordered into a large tent in a secured area away from the fighting. (R. at Allied Papers, CID Agent's Activity Summary, Vol. III). The Army accused each of them of murder and handed out sworn statement forms with instructions to complete them. *Id*. The Platoon had been in combat together for nearly six months, lost four mates to enemy fires and bombs, and were nearing the end of their tour. Now they were accused of murder on their combat patrol.

Their written statements were later "cleansed" with the administration of Article 31 UCMJ; 10 U.S.C. § 831 (2012) rights advisements, the military equivalent of *Miranda* warnings. *Id*. Some adopted their previous statements while others invoked their right to remain silent and seek legal representation. The Platoon members were referred to as "war criminals," and the members were re-assigned to different units. Eventually, nine Soldiers were given immunity and ordered to cooperate in the trial against Lorance, their new Platoon Leader who had been with the unit for about 72 hours. (R. at Grants of Immunity and Orders to Cooperate).

In response to the report of CIVCAS, the CID obtained statements that the ANA may have fired at the motorcycle, as the ANA was in the lead of this patrol. The CID also interviewed an Afghan villager named Ahad on the date of the shootings. (R. at Allied Papers, CID Agent's Activity Summary, Vol. III). Ahad identified the three men on the motorcycle as his father, Aslam, his brother Ghamai, and his uncle, Haji Karimullah. Aslam and Ghamai were killed while Karimullah escaped.

> Mr. AHAD stated his father, brother, and uncle were traveling on a motorcycle . . . his father . . . ASLAM and his brother . . . GHAMAI were killed by U.S. Forces; KARAMULLAH then ran into the village to find help") …KARAMULLAH is an important interview,

22

as he was uninjured as a rider on the motorcycle while, his relatives
were killed.

(R. at ROI Number 0254-12-CID379-77688, at 4-5 entry made by Special Agent Rasmussen).

Ahad also stated that his cousin Jam Mohammad was killed and his brother-on-law, Mohammad Rahim, who was detained with HME on his hands, was shot in the arm in the second engagement. *Id*. He also told the CID that Karimullah, the third rider who escaped from the first engagement, was a known associate of Rahim, who was shot in the arm in the second engagement by Herrmann and Carson. *Id*. When the CID interviewed Karimullah, he then stated that he knew Ahad.

One month after the Platoon fired on the motorcycle, the Army issued a Significant Activity Report, or "SIGACT" dated August 2, 2012. In it, the Army concluded that Lorance's Platoon was being scouted for an "impending attack or ambush," and that at least one insurgent was killed.

The next day, August 3, 2012, the CID interviewed Dominic Latino, the previous Platoon Leader who had been medically evacuated from the field after an IED exploded and wounded him. Latino was recovering from his injuries sustained in combat. In a type-written sworn statement, Latino related that during his tenure as Platoon Leader, he would never let a motorcycle near First Platoon because of the deadly risk it posed.

Specifically, Latino wrote, "we would not let a motorcycle into close proximity of our element due to current tactics, techniques, and procedures of enemy forces." A review of Latino's statement, however, shows that the portion in which Latino discusses the importance of not letting motorcycles near his Platoon was struck or lined out. Moreover, this key statement – injurious to the prosecution's case – was the only portion of the entire statement that had been struck or lined out.

At some point on July 2, 2012, a paratrooper picked up a *Taskera*, which is an Afghan national identification card, from one of the deceased riders. (Pros. Ex. 7). There is a picture of it in the record of trial, but the language is unreadable. *Id*. There is no evidence, however, that investigators used it to identify the man from whom it was collected. Instead, the Army returned it to the civilian population upon making a substantial *Solatia* payment (U.S. dollars in cash as an admission of fault).

The record does not reflect other efforts to identify the riders, much less determine whether or not they were known bomb-makers. Lieutenant Colonel Scott Halstead ordered the CID not to interview family members of the alleged Afghan victims, and Captain Patten, command legal advisor, declined to authorize CID Agents clearance to interview witnesses. (R. at ROI Number 0254-12-CID379-77688). The Army was making condolence payments to local villagers in July 2012. *Id*.

G. CIVCAS OR ENEMY COMBATANT BOMBMAKERS?

The prosecution initially charged Lorance with murdering Aslam and Ghamai and attempting to murder Karimullah (R. Charge Sheet). No Charges were ever brought against anybody for shooting and killing Jam Mohammad or shooting and wounding Rahim in the arm during the second engagement that occurred the same day. At some point after Charges were brought against Lorance, and for reasons unexplained in the record, the prosecutor struck or lined through the names Karimullah, Aslam, and Ghamai on the charging documents and wrote in penmanship for each specification, "a male of apparent Afghan descent." *Id*.

At trial, the prosecution pursued three main theories to show that the attempt and the killings were unlawful. First, that the three riders were CIVCAS. (R. at 417). Second, that Lorance's order did not comply with the ROE because at the time the fatal shots rang out, the

riders were no longer a threat. (R. at 646). Third, that Lorance took it upon himself to change the ROE to authorize deadly force against motorcycles on sight. (R. Charge Sheet). This latter theory fit well into the prosecution's aggressive efforts to paint Lorance as a renegade who sought to change the ROE unilaterally to gain combat experience and enhance his reputation among his new Platoon. Lorance was ultimately acquitted of telling his paratroopers that the ROE had changed to allow for the use of deadly force against motorcyclists on sight, however.

During the investigation and trial, Army biometrics databases in daily use contained information that fingerprints and DNA belonging to Ahad, Ghamai, Karimullah, and Rahim had been recovered from IED components, proving them to be terrorist bombmakers. These databases were readily accessible by the prosecution and the CID.

## H. BIOMETRICS (FINGERPRINTS AND DNA) IN AFGHANISTAN

"Biometrics in Afghanistan centers on denying the enemy anonymity among the populace." Center for Army Lessons Learned, COMMANDER'S GUIDE TO BIOMETRICS IN AFGHANISTAN – OBSERVATIONS, INSIGHTS, AND LESSONS (No. 11-25, 2011) at 37. "Biometrics is a decisive battlefield capability being used with increasing intensity and success across Afghanistan. It effectively identifies insurgents, verifies local and third-country nationals accessing our bases and facilities, and links people to events." *Id.* at (i).

"Biometrics allows an almost foolproof means of identification that is noninvasive yet extraordinarily accurate." *Id.* at 23. Soldiers carry with them enrollment devices called BAT, for Biometrics Automated Toolset, and/or HIIDE, for Handheld Interagency Identity Detection Equipment. *Id.* at 50, 61. Upon biometrics enrollment, the person is assigned a biometric enrollment number, their fingerprints and photograph are taken, an iris scan is performed, DNA is secured, personal data is obtained, all of which is uploaded as an enrollment report.

The biometrics enrollment is transmitted to the authoritative database – Automated Biometrics Identification System (ABIS) or (A-ABIS) Afghanistan Automated Biometrics Identification System, where it is stored for later reference. *Id*. at 47; 61.

When an IED event occurs, be it an explosion or where forces discover and diffuse the bomb, the GRID coordinate is recorded, the event is assigned an "IED event number," and the IED components are exploited for biometrics, *i.e*., DNA from skin left on wires when the terrorist twists the wires or fingerprints left on components. Latent fingerprints recovered from bomb parts are then compared, or "exploited," to reports already within ABIS or A-ABIS stored from previous enrollments. A "match" is often referred to as a "hit."

The reverse is also true. Fingerprint and DNA information from IED components that have been captured or recovered by American forces is uploaded, and later, when a local national physically encounters US or Coalition personnel using biometrics equipment, a match can occur linking the individual to the previously-uploaded DNA and/or fingerprint information.

"Simply stated, collecting fingerprints with biometric collection devices has led to the apprehension of bomb makers and emplacers." *Id*. at 4. "Biometrics will positively identify an encountered person and unveil terrorist or criminal activities regardless of paper documents, disguises, or aliases." *Id*. "Every staff element has a role in ensuring the proper incorporation of biometrics into mission accomplishment, and, "[a]ll units will have access to both table top and hand-held biometrics collection equipment like [BAT] and [HIIDE]." *Id*. at 21; 3.

General Petraeus lauded the technology, not only for separating insurgents from the population in which they seek to hide, but also for cracking cells that build and plant roadside bombs, the greatest killer of American troops in Iraq and Afghanistan. Fingerprints and other forensic tidbits can be lifted from a defused bomb or from remnants after a blast, and compared

with the biometric files on former detainees and suspected or known militants. "This data is virtually irrefutable and generally is very helpful in identifying who was responsible for a particular device in a particular attack, enabling subsequent targeting. Based on our experience in Iraq, I pushed this hard [for] Afghanistan, too, and Afghan authorities have recognized the value and embraced the systems."[3]

## I. ENEMY BOMBMAKERS

1) Ahad has a biometric enrollment number of B28JMUUYZ. He left his fingerprints or DNA on bomb components at IED event numbers 13/0248, 11/110317-02, 09/0520, and 10/8472.

2) Ghamai has a biometric enrollment number of B2JK9-B3R3. He left his fingerprints or DNA on bomb components at IED event number 12/1229.

3) Karimullah has a biometric enrollment number of B2JK4-G7D7. He left his fingerprints or DNA on bomb components at IED event number 12/0156.

4) Rahim has a biometric enrollment number of B28JP-QWTY. He left his fingerprints or DNA on IED components at IED event number 12/1797.

The biometrics information proving Ahad, Aslam, Karimullah, and Rahim as terrorist bombmakers and enemy combatants through fingerprints or DNA existed at the time of the investigation and trial. The information was in the Army's possession and was accessible. The prosecution, however, failed to disclose the bombmaking information to the chain-of-command, who were the charging officials. The prosecutor also failed to disclose the IED information to the defense pursuant to *Brady* and its progeny. The prosecutor did not bring the terrorist evidence to

---

[3] Thom Shanker, *To Track Militants, U.S. Has a System That Never Forgets a Face*, New York Times, July 13, 2011, *available at* http://www.nytimes.com/2011/07/14/world/asia/14identity.html?=0

the attention of the military judge. The bombmaking information was not before the jury, either during the trial phase on the merits, or during the sentencing phase.

Nor did the prosecutor produce the fingerprint and DNA evidence in response to a written defense discovery request for criminal histories or reports of violence held within military records in connection with the "deceased persons." Specifically, the defense sought records of "investigations," "apprehensions," and/or "titling," which involved "military investigatory agencies" relating to "persons who were in any way involved with the instant case," to include "deceased persons." (R. at Def. App. Ex. M, ¶¶ 2a and 2b). Although the information existed and was accessible, the prosecution never produced it to the defense, and Lorance and his attorney never were able to argue to the jury that the men killed and wounded may have been terrorist bombmakers, not "CIVCAS," as the prosecution told them.

J. <u>LORANCE RETAINS CIVILIAN CRIMINAL DEFENSE COUNSEL</u>

Up until September 2012, Lorance had been represented by a military criminal defense attorney from the U.S. Army Trial Defense Service (TDS). Lorance and his family retained a civilian defense attorney from Texas, Mr. Guy Womack, in approximately September 2012. The first time Mr. Womack met with Lorance was the morning of the Article 32 pretrial hearing on January 29, 2013, at Fort Bragg, (Fayetteville) North Carolina. (R. at Appellant's Sworn Declaration). An Article 32 pretrial hearing is required before a case can be docketed at a general court-martial, and requires the prosecution to convince the hearing officer that probable cause exists to support each of the Charges. Not only can defense counsel learn about the prosecution's case, the hearing presents an opportunity to persuade the hearing officer that probable cause does not exist, and thereby, secure a recommendation against trial.

At that point, however, Mr. Womack had not reviewed the CID file, talked with witnesses, interviewed Lorance in-depth, proposed and adopted a tactical approach with his client's awareness for the significant evidentiary hearing forthcoming, nor provided to the prosecution a list of witnesses or evidence for production and use at the hearing. No Afghan witnesses (to include the attempted murder victim Karimullah, the eyewitness Ahad, or the wounded eyewitness Rahim) were called or examined by either the hearing officer, the prosecution, or the defense.

Between the Article 32 pretrial hearing and the actual trial, retained civilian counsel did not meet with Lorance in person, and had only communicated with Lorance by E-mail and a few short phone calls. *Id.* The day before Lorance's trial in Fayetteville, North Carolina, civilian counsel was defending a rape case in San Antonio, Texas. The rape case recessed at approximately 4:00 p.m. in Texas, or 5:00 p.m. in North Carolina. *Id.* Counsel then flew to Fayetteville, North Carolina that evening, the place of the Lorance trial, and called Lorance from the car on his way from the airport to hotel. *Id.* He did not meet with Lorance that night. *Id.* The second time retained civilian counsel met with Lorance was the morning of a fully contested double murder and attempted murder jury trial where Lorance faced potential incarceration for life. Additionally, retained civilian counsel did not:

(1) Draft, file, or argue any pretrial motions to suppress or *in limine*;

(2) Seek or secure consulting or testifying experts on biometrics, the ROE, or use of force;

(3) Interview the American witnesses against Lorance, including the CID agents who investigated the case;

(4) Interview the attempted murder victim, Karimullah;

(5) Interview the eyewitness shot in the arm, Rahim;

(6) Interview Ahad, who identified the motorcyclists, and knew them to be associates of

29

bombmakers;

(7) Interview any of the ANA soldiers, given reports that the ANA may have fired first on the motorcycle;

(8) Move to compel production of fingerprint and DNA evidence of bombmaking;

(9) Interview Dominic Latino about his time as Platoon Leader and his lined-out sworn statement that he would never let a motorcycle near his Platoon;

(10) Secure and use the Army's SIGACT report noting that Lorance's Platoon was being scouted for an enemy attack or ambush and that one insurgent was confirmed killed;

(11) Seek to have Rahim's bloody clothing seized by the CID after he was shot in the arm, analyzed in order to use any DNA to determine whether Rahim was a terrorist bombmaker;

(12) Prepare or present a defense case-in-chief;

(13) Develop or present the recognized affirmative defenses of justification, duress, mistake of fact, or obedience to lawful orders;

(14) Cross-examine witnesses on the fact that they received grants of immunity for murder, and were ordered to cooperate;

(15) Accept the trial judge's invitation to issue jury instructions on affirmative defenses, immunity for testifying witnesses, or lesser-included offenses; or

(16) Prepare Lorance to testify in his own defense.

*Id.*

K. PETITION FOR A NEW TRIAL

After trial, Lorance retained new defense counsel for his appeal. Because the record of trial did not contain a copy of the complete, final, unredacted CID report in this case (and still does not), counsel requested it directly from the CID and from the senior officer of the 82nd Airborne

Division, the Commanding General, who had jurisdiction over the case at that time. The Army denied both requests. To date, the report has not been disclosed.

Veterans of the wars in Afghanistan and Iraq, undersigned appellate counsel's initial investigation revealed that available on US Army databases were records that Ahad, Ghamai, Karimullah, and Rahim left their fingerprints or DNA on IED components, some at locations (determined by GRID coordinates) where American and Coalition personnel had been killed or wounded.

Based on this newly-discovered evidence, on September 14, 2015, Lorance timely filed a New Trial Petition before the Army Court pursuant to Article 73, UCMJ; 10 U.S.C. § 873 (2012). The Army Court is comprised of commissioned Army officers who are licensed attorneys appointed to the Judge Advocate General's Corps, or "JAG." *See* 10 U.S.C. § 866 (2012). Usually in the grade of Lieutenant Colonel or Colonel, these military officers are personally selected by The Judge Advocate General of the Army, a three-star Lieutenant General. The Chief Judge is an Army Brigadier General (one-star). The Army Court sits on Fort Belvoir, Virginia, near Washington DC.

In his New Trial Petition, Lorance argued that the prosecution should have disclosed the fingerprint and DNA evidence, even in the absence of a defense request, and the prosecution's failure to turn over the exculpatory and mitigating information deprived him not only of the capability to prepare a forceful defense, but also a fair trial and fair sentencing hearing. In support, Lorance cited the prosecution's obligation to disclose material exculpatory and impeachment evidence as part of the constitutional guarantee to a fair trial. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972). Lorance noted that the law requires the disclosure of exculpatory and impeachment evidence when such evidence is material to guilt or

punishment. *Brady*, 373 U.S. at 87; *Giglio*, 405 U.S. at 154. He explained that because they are constitutional obligations, *Brady* and *Giglio* evidence must be disclosed regardless of whether the defendant makes a request for exculpatory or impeachment evidence. *Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995).

Lorance cited authority that exculpatory and impeachment evidence is material to a finding of guilt—and thus the Constitution requires disclosure—when there is a reasonable probability that effective use of the evidence will result in an acquittal. *United States v. Bagley*, 475 U.S. 667, 676 (1985). Recognizing that it is sometimes difficult to assess the materiality of evidence before trial, Lorance noted that prosecutors generally must take a broad view of materiality and err on the side of disclosing exculpatory and impeaching evidence. *Kyles*, 514 U.S. at 439.

In the event the Army Court concluded that the prosecution was not constitutionally required to disclose the fingerprint and DNA evidence of bombmaking, Lorance claimed his pretrial written request was specific to trigger the prosecution's search and production obligations. Essentially, Lorance argued that the fingerprint and DNA evidence about the victims and eyewitnesses constituted information inconsistent with elements of charged offenses and established various affirmative defenses.

Lorance also requested that the Army Court take up his New Trial Petition separately and independently from any other appellate challenge:

> Finally, because this single issue is so pervasively pivotal, meritorious, and dispositive, this Court should consider and decide this Petition directly and separately from any subsequent assignments of error 1LT Lorance may file. Indeed, should the Court grant the requested relief, the necessity to file assignments of error will be mooted.

(R. at Lorance's Brief in Support of New Trial Petition at 27).

The Army Court ordered Lorance to file all of his appellate claims by December 9, 2015. On November 12, 2015, Lorance moved the Army Court to reconsider its appellate briefing order and moved to expedite resolution of the Petition separately from any other appellate claims to be filed. On November 13, 2015, the Army Court denied the motion to extend the appellate briefing schedule until after the New Trial Petition was resolved, but granted Lorance's motion to expedite resolution of the New Trial Petition.

Lorance sought separate and expedited consideration of his New Trial Petition largely on the grounds that resolution of the Fifth Amendment Due Process issues could have been dispositive and thereby rendered the more comprehensive overall appeal moot, and, that each day served in unlawful confinement could not be re-lived. Lorance believed the prosecution's failure to disclose exculpatory evidence favorable to the defense justified a new trial, thereby dispensing with the need to raise all appellate errors. Lorance determined the undisclosed fingerprint and DNA evidence should be presented to a new jury to exonerate him of the Charges, and at the very least, be considered as powerful mitigation evidence to reduce or eliminate his sentence.

L. DIRECT APPEAL TO THE ARMY COURT OF CRIMINAL APPEALS

While his New Trial Petition was fully briefed and pending before the Army Court, Lorance, pursuant to court-order, filed his overall appeal and brought six claims. The first included the Fifth Amendment denial of Due Process set forth in the New Trial Petition and incorporated it by reference. Lorance also brought a Sixth Amendment ineffective assistance of counsel claim and cited *Strickland v. Washington,* 466 U.S. 668, 686 (1984), and its progeny to demonstrate that counsel's performance was deficient and resulted in actual and material prejudice to Lorance.

He also argued that the trial judge abused her discretion in failing to provide instructions

to the jury *sua sponte* and in accordance with binding precedent, on the affirmative defenses raised by the evidence, to include justification, obedience to orders, duress, and mistake of fact (if a special defense is reasonably raised by the evidence, the [trial] judge has a *sua sponte* duty to instruct the jury on the defense). *United States v. Davis*, 53 M.J. 202, 205 (C.A.A.F. 2000); *see also* RCM 916. Lorance further claimed that these prejudicial errors resulted in legally and factually insufficient convictions and sentence. Lorance asked the Army Court to disapprove the findings and the sentence or in the alternative, order a new trial.

M. THE ARMY COURT'S FINDINGS

On June 27, 2017, the Army Court denied Lorance's request for a hearing. On the same day, the Army Court denied his New Trial Petition (which it had consolidated with the overall appeal), denied any relief, and affirmed the convictions and the sentence in an unpublished opinion. *United States v. First Lieutenant Clint A. Lorance*, United States Army Court of Criminal Appeals, Number 20130679, June 27, 2017 (unpub.). A review of the Army Court's decision reveals that it is closer akin to a work of advocacy, rather than a careful and impartial review of the evidence presented and the issues raised by Lorance on appeal.

In its discussion of the background leading up to the engagement, the Army Court paints Lorance, who had recently taken over as Platoon leader after his predecessor had been wounded, as an unwelcome bully intruding his own aggressive ideas on the village of Sarenzai. (Army Court Opinion, at 2-3). The Army Court does not describe that in the months before Lorance had taken over, the Platoon had been attacked every time it had entered the village and that nearly every patrol that had left the Strong Point had been attacked. (R. at 509). Instead, the Army Court adopts and advances the prosecution's narrative to the exclusion of evidence supporting Lorance's claims.

Likewise, the Army Court described the ROE in effect, noting that no enemy forces had been declared hostile, and that American Soldiers were allowed to fire only when they perceived a threat. (Army Court Opinion at 2). The Army Court goes on to describe the sign Lorance had placed in the Platoon headquarters indicating that no motorcycles would be allowed in the area of operations. *Id.* at 3. The prosecution had offered these points in support of its theory that Lorance unilaterally changed the ROE to allow motorcycles to be engaged on sight.

But the Army Court ignores entirely that the jury found Lorance not guilty of changing the ROE to engage motorcycles on sight. Lorance's acquittal on this charge is not mentioned in the Army Court's decision. The same can be said about critical testimony of ROE compliance that the Army Court did not include in its written decision. The Army Court writes that Skelton, who fired the first shots at the oncoming motorcyclists, did so only because Lorance ordered him to fire. (Army Court Opinion at 3). The testimony the Army Court cites is buried in Skelton's re-direct examination, well after a lengthy discussion of the engagement. (R. at 601).

The Army Court ignores, however, Skelton's initial testimony that the "first thought" he had when he saw the motorcyclists was that "it could be a drive-by shooting; it could be a drive-by grenade throw; it could be a vehicle-borne IED." (R. at 537). Also, Skelton testified that he fired his rifle to protect his unit and himself in compliance with the ROE that authorized self-defense and unit self-defense:

> Q. It was your obligation, as you saw it, to say to Soldiers that the motorcycle was possibly threatening because of the potential threat it represented, correct?
>
> A. (Skelton) We have the right to protect ANA and coalition forces, yes.
>
> Q. And at the time that you fired, you believed that's what you were doing; you were protecting friendly forces, both American and ANA.

> A. (Skelton)Based on -- based on ROE and my quick threat analysis of what could happen, yes.
>
> Q. Yes. So this I'll ask you, okay. Based on what you had available to you, you saw this as a threat and you felt an obligation as an American Soldier to protect friendly forces, American and ANA, correct?
>
> A. (Skelton)Yes.

(R. at 585–586).

Lorance reproduced this verbatim transcript testimony in his papers to highlight evidence of ROE compliance on which he based his order to the gun truck, which fired the fatal rounds. Lorance then alerted the Army Court that five witnesses stated that the fatal rounds from the gun truck were fired "three seconds," "a few seconds," "five seconds," "10 seconds" and "20 – 30 seconds," after the initial volley at the three riders. (R. at 384, 497, 501, 655, 658, 675).

Yet, the Army Court did not address the fundamental question of whether the rounds fired from the gun truck based on Lorance's order were justified, made in self-defense, or in unit self-defense, under duress, by mistake, or in obedience to orders. More importantly, the Army Court did not address the most critical issue head on: whether ROE-compliant shots fired in a volatile, unfolding, complex, and ambiguous combat environment that killed IED-makers could lawfully constitute two specifications of murder or one specification of attempted murder. These points are altogether missing from the Army Court's decision.

Further, the Army Court declined to accept as reliable the fingerprint and DNA evidence offered by a sworn affidavit from a biometrics expert that the purported civilians left their fingerprints and skin (DNA) on IED components. The Army Court also found that a prosecutor and investigators in a case involving two murders and an attempted murder in a combat zone, where the enemy blends in with the civilian population, do not have to "search into the abyss of

the intelligence community for the potential existence of unspecified information." (Army Court Opinion at 6).

The Army Court's findings ignore entirely that American forces in Afghanistan used biometric data on a daily basis as they interacted with the Afghan population, *see* Sections G and H, *supra*, and suggest an unsupported an inaccurate version of the reality in Afghanistan when it comes to the use of biometric data. Moreover, insofar as the relevance of the biometric evidence is concerned, the Army Court found that "we can see no scenario for the admissibility of such evidence during the trial." (Army Court Opinion at 7). But in doing so the Army Court ignores entirely that Lorance needed the evidence to rebut the prosecution's narrative that the Afghan men were mere villagers and victims – a narrative the Army Court adopted in whole, notwithstanding the sworn biometric expert evidence, unchallenged, before the Army Court on appeal proving bombmaking activity.

The Army Court's conclusion that the evidence was irrelevant also ignores that one of the jury members actually asked about what information or intelligence had been collected relevant to the threat to the patrol. By way of background, courts-martial jury members are permitted to submit questions to the military judge to pose to the witnesses. *See* Mil. R. Evid. 614. One juror inquired from Skelton, the Soldier who fired at the motorcycle but missed, what information or intelligence had been gathered from the Afghans who were detained immediately following the July 2, 2012, firefight that might impact the Platoon's patrol. (R. at 615-616). The fact that at least one juror was interested in determining whether there was additional information or intelligence that the motorcyclists actually posed a threat to the Platoon defeats the efforts on the part of the prosecution and the Army Court to discount the importance of it.

37

The Army Court did not apply the international law of armed conflict (LOAC), a well-developed body of law which holds generally that if a target has military value and the means used to destroy the target are proportional, civilians that are killed are not murdered, but instead, by international law, called "collateral damage." In the far less dangerous realm of domestic civilian law enforcement, police officers are provided qualified immunity even if they make a mistake of fact, which Lorance did not even make in this instance: his instincts based on Skelton's threat assessment were right.

After having ordered retained civilian defense counsel to submit a sworn affidavit in response to Lorance's Sixth Amendment ineffective assistance of counsel claim, in which he stated that not interviewing witnesses prior to trial is a "superior" trial tactic, the Army Court found counsel's performance effective and non-prejudicial to Lorance. This is notwithstanding the deficiencies Lorance presented to the Army Court, discussed, *supra*.

In its decision, the Army Court did not address Lorance's claims in connection with jury instructions, legal and factual insufficiency, and did not apply the correct legal framework to evaluate Lorance's New Trial Petition under the applicable precedents and recognized rubric of Article 73, UCMJ; 10 U.S.C. § 873 (2012), and RCM 1210, which weighed in favor of granting a new trial based on the discovery of the bombmaking evidence the prosecution failed to disclose.

N. <u>THE COURT OF APPEALS FOR THE ARMED FORCES DENIES REVIEW</u>

After the Army Court issued its decision, Lorance timely filed a Petition for a Grant of Review before the CAAF, which is located in Washington, D.C. and comprised of five civilians appointed by the President to fifteen-year terms. Whether to grant review or not in a case like Lorance's is within the CAAF's discretion. *See* Article 67, UCMJ; 10 U.S.C. § 867 (2012). On October 10, 2017, Lorance filed a Supplement to his Petition for a Grant of Review. On the same

day, Amicus Curiae moved for leave to file a brief to encourage the CAAF to review Lorance's

case, describing their interest in the case as:

> [A] group of interested retired Combat Arms Commanders and
> Judge Advocates who – with their combined hundred plus years of
> combat experience – feel that not only is the Appellant's conviction
> morally and legally wrong, but that it also has a chilling, dangerous
> impact on our Nation's warriors' ability to defend themselves in
> combat.

(R. at Petition to File Amicus Curiae Brief). The names of those signing the brief and a brief

description of their military experience is at Attachment B.

On December 12, 2017, the CAAF denied Amicus Curiae's motion to file a brief. On

December 19, 2017, the CAAF summarily denied Lorance's Petition for a Grant of Review. *United*

*States v. Lorance*, ARMY 20130679, 2017 WL 2819756 (Army Ct. Crim. App. June 27,

2017), *review denied*, 77 M.J. 136 (App. Armed Forces 2017). The CAAF's denial prevented

direct appeal to the United States Supreme Court. Article 67, UCMJ; 10 U.S.C. § 867 (2012); 28

U.S.C. § 1259.

### O. CHIEF JUDGE OF THE ARMY COURT PUBLICLY MISSTATES THE FINDINGS

On March 15, 2018, the Chief Judge of the Army Court, who is also the Commander of the

U.S. Army Legal Services Agency, Brigadier General Joseph Berger, appeared in uniform at the

Center for Strategic and International Studies (CSIS), a respected Washington, D.C. think tank.

*See* Center for Strategic & International Studies, *The My Lai Massacre History, Lessons, and*

*Legacy: A Panel Discussion with Historians and Military Law Experts*, Thursday, March 15, 2018,

1:30 p.m. – 3:30 p.m., CSIS Headquarters, podcast available: https://www.csis.org/events/my-lai-

massacre-history-lessons-and-legacy.

The Chief Judge made public comments about Lorance as a "bad apple" who wanted to

fight the war his own way, and likened Lorance to First Lieutenant William Calley of the *My Lai*

Massacre (although, unlike Lorance, Calley actually fired his rifle, and he and his unit killed over 200 women, children, and elderly villagers). *Id*. The Chief Judge echoed the Army Court's suggestion that Lorance changed the ROE to fire on motorcycles on site, even though the jury found Lorance not guilty of that offense. *Id*. Specifically, the Chief Judge wrongly informed the audience the following:

> Clint Lorance was a very aggressive Lieutenant, who had his own ideas about how the war in Afghanistan should be being fought. Those ideas were not in align with the rules of engagement. And that's the fundamental fact that starts us off the trail here. And off the rails. Lorance gives his Soldiers guidance that is not in accordance with the ROE. Motorcycles are allowed to be engaged on sight - that's the guidance given. Not a lawful order, but his Soldiers don't necessarily know that, because a change to the ROE would logically come through the chain of command.[4]

The Chief Judge's comments to the public  merely parroted the prosecution's narrative depicting Lorance as overly-aggressive, ignored entirely that Lorance had been acquitted of changing the ROE, and demonstrated further that the Army Court viewed its role in reviewing the conviction as placing its seal of approval on the prosecution rather than conducting meaningful review.

Lorance's defense team, all military veterans and former active duty prosecutors in the Army, Navy, and Air Force, wrote the Chief Judge and expressed concerns about his public misstatements and that his comments appeared to be those of an advocate defending the Army's position rather than senior legal officers ensuring that the law was fairly and correctly applied as part of a reliable criminal prosecution compliant with Due Process. In their letter to Brigadier General Berger, counsel for Lorance wrote in part:

---

[4] The Chief Judge's comments can be seen and heard at https://www.csis.org/events/my-lai-massacre-history-lessons-and-legacy (last viewed August 22, 2018) 1:34; *see also* https://www.youtube.com/watch?v=Nu8ODkvwZpg (last viewed August 22, 2018) 1:34.

The comments you publicly made at the CSIS suggest that your briefing officers, like the Army Court of Criminal Appeals, did not appreciate that the panel acquitted 1LT Lorance of changing the rules of engagement. It is for this incorrect assertion, the need for corrective action, and the necessity to ensure that legal advice to Army Leaders is accurate that we primarily write. We do not seek to defame or denigrate those prosecutors who may have briefed you about this matter, but rather to correct the record regarding what occurred that day and respectfully solicit your assistance to take corrective action. That is, we appeal to your sense of duty, honor, and integrity to seek your help in seeing that justice is done.

\* \* \* \* \*

First, the jury acquitted 1LT Lorance of changing the ROE. Your comments that he did took it upon himself as a "bad apple" to change the ROE are inconsistent with the panel's findings on this point. To portray 1LT Lorance like this is an "unfair prosecutorial blow." Second and equally troublesome is that the Army Court of Criminal Appeals in its June 2017 decision said the same thing - that 1LT Lorance changed the ROE to engage motorcycles on sight. The Army Court took a position totally at odds with the jury's determination on the same point. Consequently, the Army Court erred by depriving 1LT Lorance of meaningful appellate review when it premised its affirmance on an incorrect finding. The Army Court's errant finding and your public comments perpetuating the error are not only unfairly prejudicial to 1LT Lorance, but also to the Army JAG Corps' reputation as fair-dealing "straight shooters."

\* \* \* \* \*

ROE compliance cannot be murder or attempted murder. Only after PFC Skelton fired his rifle while perceiving the threat, did 1LT Lorance, who never fired his rifle, radio a gun truck to engage the target that PFC Skelton identified as a threat to the Platoon. Five witnesses stated that the fatal rounds were fired "three seconds," "a few seconds," "five seconds," "10 seconds" and "20 – 30 seconds," after PFC Skelton fired the initial volley at the three riders. (R. at 384; 497; 501; 655; 658; 675).

It is a patent mis-statement of fact that 1LT Lorance told any of his Soldiers that they may fire on any motorcycle.

\* \* \* \* \*

Accordingly, your statement that, "Lorance tells a Soldier to go ahead and engage a motorcycle, that Soldier does, fortunately he misses," is at-odds with the trial transcript and PFC Skelton's Article 32(b) sworn testimony.

Fourth, it is worth noting that after 1LT Lorance's court-martial, his new legal team uncovered biometric evidence that demonstrates conclusively that the men on the motorcycle were, in fact, bomb-makers. In other words, their fingerprints and/or DNA were found on improvised explosive devices that were designed to kill American Soldiers and matched to the riders and other local-nationals engaged on the field that day.

Although 1LT Lorance was not aware of the biometrics when he gave the order to his overwatch gun truck after PFC Skelton engaged the riders, the biometric evidence is still very much important to the chain-of-command's disciplinary decisions, legal advice given at the time of preferral and referral, admissible at trial to rebut the prosecution's claim that the riders were civilian casualties, and surely as mitigation on sentencing. What is more, a panel of 82nd Airborne Officers surely would have considered the fact that the enemy was killed exonerating or at the very least, mitigating. Yet, the prosecution neither disclosed the evidence per *Brady* and rule for courts-martial 701(a)(6), or produced it in response to defense written discovery which sought criminal or violent history of all local-nationals on the field that day.

* * * * *

Stated more simply, 1LT Lorance's platoon killed the bad guys. They followed the ROE and did precisely what this country sent 1LT Lorance to do when it deployed him to Afghanistan and ordered him to lead paratroopers on combat patrols in a combat zone where the platoon recently suffered four casualties. Yet the prosecutors were allowed to tell the jury that the dead mean were civilian casualties, painting 1LT Lorance as a bad-actor.

* * * * *

The bottom line: ROE compliance (PFC Skelton) coupled with killing the enemy (biometrics attached to the record of trial and the basis for our motion for a new trial) cannot be murder or attempted murder – which is the situation now before us. But, Sir, there is something you, as a Leader of character, and honor sworn to uphold our highest traditions, can do about this.

This case is presently before the Secretary of the Army for action after the Court of Appeals for the Armed Forces declined to grant 1LT Lorance's petition for review. We attach Clint's CAAF Supplement for your review. If the Army's legal advice, and if the facts provided to the Secretary of the Army are in line with the comments you stated publicly on March 15, 2018, senior Army civilian Leaders will be mis-informed, and an injustice will be perpetuated. Additionally, 1LT Lorance has a request for Executive clemency pending before the Justice Department's Office of Pardon Attorney. If the Army provides to that office a factual narrative that is similar to the statements you made publicly on March 15, 2018, another legal error will be made, and there will be a grave injustice to an American Soldier and we believe, to the Army JAG Corps' reputation as "doing the right thing" and "speaking truth to power."

We would welcome the opportunity to discuss this with you further, and in person. And we respectfully request, at a minimum:1) that a copy of this letter be provided to the Secretary of the Army before he acts on 1LT Lorance's case, and that any recommendation Army attorneys have made to the Secretary of the Army reflect the factual statements made above; 2) that it be delivered to the U.S Department of Justice Office of the Pardon Attorney on behalf of the Army; 3) that the legal recommendation be to disapprove the findings and the sentence; or 4) in the alternative, grant 1LT Lorance's petition for a new trial.

(Letter to Brigadier General Joseph Berger dated March 24, 2018).

In response, the Chief Judge initially granted a request for a meeting, but that request was rescheduled a number of times until it became clear that the door was closed.[5] The Chief of the Criminal Law Division in the Office of The Judge Advocate General assured Lorance that his concerns expressed to the Chief Judge by letter would be taken into consideration when the Secretary acted on the case. *See* Letter from Office of The Judge Advocate General ("OTJAG') Chief of Criminal Law, Colonel William D. Smoot, dated April 12, 2018.

---

[5] E-mail exchanges between Kevin Mikolashek, Esquire and Brigadier General Berger's Executive Officer between March and May 2018 confirming a meeting, setting the meeting for May 7, 2018, followed by a series of scheduling conflicts.

By calling Lorance a "bad apple," suggesting he had gone "off the rails," and comparing him to Captain Calley (who was accused of murdering hundreds of villagers and convicted of murdering 22 people), it seems clear that the Chief Judge sought to publicly influence the Secretary of the Army not to take favorable action on Lorance's case and to poison the well against Lorance for any future judges who might hear his case, or any attempts for the President to "disaffirm the findings and the sentence."

A reasonable conclusion is that the Chief Judge chose to make his public misstatements and decline to correct them upon request to put his thumb and the weight of his senior position on the scale of justice against Lorance and in favor of the Army, a position that a sitting Chief Judge ought not take--especially when his position requires objectivity and ensuring the integrity of the legal process rather than defense of a desired outcome.

## P. THE JUDGE ADVOCATE GENERAL REPEATS THE CHIEF JUDGE'S MISSTATEMENTS

But, despite the Army's representations that its advice to civilian leadership would be corrected, The Judge Advocate General of the Army himself, Lieutenant General Charles Pede, echoed the all but the same inaccurate comments Chief Judge Berger had publicly made on March 15, 2018, months later to at least one Member of the United States House of Representatives.[6] That he did so after Lorance's defense team brought the serious misstatements to the Army's attention demonstrates an unwillingness to voluntarily take corrective action, a desire to publicly influence the Secretary of the Army not to take favorable action on Lorance's case, and an effort to poison the well against Lorance for any future judges who might hear his case or any attempts for the President to "disaffirm the findings and the sentence."

---

[6] Telephone conversation between Lieutenant General Charles Pede and United States Representative Garrett Graves.

44

His comments reliably suggest that the Judge Advocate General sought to put his thumb and the weight of his senior position on the scale against Lorance and in favor of the Army, defending a desired outcome as opposed to ensuring the integrity of the military justice process.

On June 14, 2018, the Secretary of the Army's designee took final action on Lorance's case, taking no favorable action and ordered Lorance dismissed from the Army.

While Lorance's case was awaiting action by the Secretary of the Army as required by law, thousands of concerned Americans had signed and sent petitions urging disapproval of the findings and the sentence.[7] Representatives of the Army Judge Advocate General's Corps informed Lorance that if he did not coordinate removal of the dozens of bankers' boxes containing the petitions from the halls of the Pentagon near the Secretary of the Army's office, they would be thrown in the garbage.

> The Office of the Judge Advocate General Criminal Law Division received approximately 55 boxes of petitions in support of a presidential pardon. A representative copy of the petition is attached. They do not have space to store these boxes. If you want these petitions, please contact MAJ [     ] at 571-xxx-xxxx (office) to make arrangement for pickup. If they don't receive an answer by the end of the week (May 19, 2017), they will assume the petitions are not wanted and shred them.

(Email dated May 15, 2017).

The Judge Advocate General did not consider these petitions when he prepared his recommendation to the Secretary's designee. Additionally, they were not mentioned or shown to the Secretary's designee in June 2018 when he declined Lorance's request for favorable action and instead approved the sentence. The Secretary of the Army had the authority to disapprove the findings and the sentence.

Q. THE DEPARTMENT OF JUSTICE OFFICE OF THE PARDON ATTORNEY

---

[7] A representative sample of the signed pardon petitions can be viewed at https://www.freeclintlorance.com.

In December 2016, Lorance filed a request "disapprove the findings and the sentence" to President Obama, the Office of the Pardon Attorney, and the Secretary of the Army.[8] In February 2017, Lorance revised his requests to address President Trump, as well as the Office of the Pardon Attorney and the Secretary of the Army.[9]

In August 2018, members of the Army's Criminal Law Division at the Pentagon informed Lorance that neither of his requests were received, and that he should consider resubmitting them, even though thousands of petitions for a pardon were received and were going to be shredded if Lorance did not coordinate their removal from the Office of the Secretary of the Army.

The same personnel informed Lorance that the Office of the Pardon Attorney refuses to process applications for Presidential clemency, commutation, or pardons for military applicants. Even if a military prisoner seeks direct access to the President of the United States for a commutation, clemency, a pardon, or as in Lorance's case, "disapproval of the findings and the sentence" pursuant to Article II of the Constitution, the Justice Department's Office of the Pardon Attorney will not process the request for action. Instead, in a disturbingly circular fashion, the Office of the Pardon Attorney will return the case to the same branch of the military and the legal officers who imprisoned the applicant.

> This is in response to your follow up email from earlier today inquiring further about the Department's policy with regard to military commutation requests. Please take a moment to review our longstanding policy on the subject at [:] https://www.justice.gov/pardon/policies#s4. The response you received earlier today was accurate because we do not handle or accept petitions on behalf of individuals wishing to seek commutation of sentence for a military conviction. That is outside of the scope of our mission and that is best response I can provide.

---

[8] Request for Presidential Action – Disapprove Convictions, addressed to President Barack H. Obama, the Pardon Attorney, and the Secretary of the Army, dated December 10, 2016.
[9] Request for Presidential Action – Disapprove Convictions, addressed to President Donald J. Trump, the Pardon Attorney, and the Secretary of the Army, dated February 14, 2017.

(E-mail from William Taylor II, Executive Officer, Office of the Pardon Attorney, U.S. Department of Justice (June 29, 2018)) (underline emphasis original). It returns his case to the very institution of government and its representatives that imprisoned him in the first place, refused to fully and fairly consider exonerating fingerprint and DNA evidence from its own databases, applied the wrong legal standards, determined defense counsel's assistance effective, misinformed the public and the Congress about the true nature of the case, declined to openly correct questionable legal advice and dialogue, threatened to throw thousands of citizens' petitions to the Secretary of the Army in the garbage, and adopted an adversarial posture, to include misinforming the public and at least one Member of the United States House of Representatives about the jury's findings, to defend the result in *Lorance* rather than ensuring the integrity of the legal process.

"Citizens in uniform may not be stripped of basic rights simply because they have doffed their civilian clothes." Warren, *The Bill of Rights and the Military*, 37 N.Y.U. Law Rev. 181, 188 (1961). The foregoing are compelling reasons why this Court should reach the merits of Lorance's habeas petition because it is clear that the Army neither fully nor fairly considered his constitutional claims.

VIII. <u>GROUNDS FOR WHICH LORANCE SEEKS HABEAS CORPUS RELIEF</u>

The Supreme Court held in *Burns*, which remains applicable in the Tenth Circuit today:

> The constitutional guarantee of due process is meaningful enough, and sufficiently adaptable, to protect Soldiers – as well as civilians – from the crude injustices of a trial so conducted that it becomes bent on fixing guilt by dispending with rudimentary fairness rather than finding truth through adherence to those basic guarantees which have long been recognized and honored by the military courts as well as the civilian courts.

*Burns,* 346 U.S. at 142.

The Article I legislative courts, military courts in this case, failed to give adequate

consideration to the issues involved, failed to apply proper legal standards to his claims, and neither fully nor fairly considered his constitutional claims, such that this Article III Court may reach the merits and decide the issues to ensure constitutional guarantees and justice were properly observed. *Burns*, 346 U.S. at 137.

### A. Ground One - Fifth Amendment Due Process

#### Law

The Supreme Court has recognized the "special role played by the American prosecutor" in the search for truth. *Strickler v. Greene*, 527 U.S. 263, 281 (1999). Prosecutors have a continuing interest in preserving the fair and effective administration of criminal trials. Accordingly, the American Bar Association states that a prosecutor's duty is "to seek justice within the bounds of the law, not merely to convict." A.B.A. Standards for Criminal Justice: *Prosecution and Defense Function*, Standard 3-1.2(c) (4th ed. 2015).

Fundamental to fulfilling this duty is making timely disclosure of all evidence favorable to the defense. As the Supreme Court recognized in *Brady*, 373 U.S. at 87, the failure to disclose favorable evidence "violates due process…irrespective of the good faith or bad faith of the prosecution." *See also United States v. Nixon,* 418 U.S. 683, 709 (1974) ("[t]he very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence.").

This affirmative duty is above and beyond the "pure adversary model," *Bagley*, 473 U.S. at 675 n.6, it is also grounded in the recognition of the prosecutor's "special role in the search for truth in a criminal trial." *Banks v. Dretke*, 540 U.S. 668, 696 (2004). Accordingly, in *United States v. Agurs*, 427 U.S. 97, 110 (1976), the Supreme Court held that a prosecutor is required to disclose certain favorable evidence "even without a specific request" from the defense. The Supreme Court

reasoned that "obviously exculpatory" evidence must be disclosed as a matter of "elementary fairness," and that prosecutors must be faithful to their duty that "justice shall be done." *Id*. at 107, 110, 111.

Prosecutors are subject to heightened ethical obligations due in part to their special position. *Berger v. United States*, 295 U.S. 78, 88 (1935) ("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose interest, therefore, in a criminal prosecution is not that is shall win a case, but that justice shall be done.").

As representatives of the United States, prosecutors cannot lose sight that their duty is more than to be exclusively adversarial or ardent advocates. *Bagley,* 473 U.S. at 675 n.6. It is not the prosecutor's responsibility to win at all costs but rather to "ensure that a miscarriage of justice does not occur." *Id.* at 675. Basic to this duty and obligation is "disclos[ing] evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *Id.*

Exculpatory and impeachment evidence is material to a finding of guilt—and thus the Constitution requires disclosure—when there is a reasonable probability that effective use of the evidence will result in an acquittal. *Id.* at 676. Recognizing that it is sometimes difficult to assess the materiality of evidence before trial, prosecutors generally must take a broad view of materiality and err on the side of disclosing exculpatory and impeaching evidence. *See Kyles,* 514 U.S. at 439. A prosecutor does *not* have to have actual knowledge of the evidence to commit a *Brady* violation. *Giglio*, 405 U.S. at 150. "The individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles,* 514 U.S. at 437.

The Justice Manual, until recently known as the United States Attorney's Manual, sets forth Justice Department policy and counsels, in part:

It is the obligation of federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all the members of the prosecution team. Members of the prosecution team include federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant.

* * * * *

A prosecutor must disclose information that is inconsistent with any element of any crime charged against the defendant or that establishes a recognized affirmative defense, regardless of whether the prosecutor believes such information will make the difference between conviction and acquittal of the defendant for a charged crime.

* * * * *

A prosecutor must disclose information that either casts a substantial doubt upon the accuracy of any evidence—including but not limited to witness testimony—the prosecutor intends to rely on to prove an element of any crime charged, or might have a significant bearing on the admissibility of prosecution evidence.

*Justice Manual*, United States Department of Justice, 9-5.002 Criminal Discovery (internal citations omitted).

Due process requires that disclosure of exculpatory and impeachment evidence material to guilt or innocence be made in sufficient time to permit the defendant to make effective use of that information at trial. *See*, *e.g.* *Weatherford v. Bursey*, 429 U.S. 545, 559 (1997).

SPECIFIC GROUNDS

1. Lorance was deprived of the rights guaranteed to him by the Fifth Amendment Due Process Clause in that the prosecution failed to disclose the exculpatory evidence described below.

(a) In US Army and Government databases (which are easily accessed by the prosecution) information existed showing that material witness Ahad, decendant Ghamai, attempted murder victim Karimullah, and material eyewitness Rahim left their fingerprints or DNA on IEDs. The

prosecution had access to this information but failed to include as part of its investigation or disclose it to the charging officials or the defense for its development or use.

(b) The Army completed a Significant Activity Report dated August 2, 2012, which concluded that Lorance's Platoon was being scouted for an impending attack or ambush and that one insurgent fighter was confirmed killed. The prosecution had access to this report but failed to include it as part of its investigation or disclose it to the charging officials or the defense for its development or use. The report states that it is "version 9," suggesting that at least eight previous iterations of the report exist, but were none were disclosed to charging officials nor disclosed or produced to the defense for its development and use.

(c) Before trial, the defense filed a written discovery request with the prosecution seeking criminal histories or reports of violence held within military records in connection with the "deceased persons." The defense sought records of "investigations," "apprehensions," and/or "titling," which involved "military investigatory agencies" relating to "persons who were in any way involved with the instant case," to include "deceased persons." In US Army databases, information existed showing that that material witness Ahad, descendant Ghamai, attempted murder victim Karimullah, and material eyewitness Rahim left their fingerprints or DNA on IEDs. The prosecution had access to this information but failed to produce it in response to the defense request.

(d) An Army CID Special Agent, working on behalf of the prosecution, interviewed the previous Platoon Leader, Dominic Latino, on August 2, 2012, and took his written sworn statement. Lorance replaced Latino, who was medically evacuated from the battlefield after an IED exploded and wounded him. Then assigned to the Warrior Transition Battalion while recovering from his combat wounds, Latino initially wrote that "we would not let a motorcycle

into close proximity of our element due to current tactics, techniques, and procedures of enemy forces." This sworn testimony stood to prove Lorance's order to fire on the approaching motorcycle as reasonable and lawful under the deadly circumstances in Afghanistan. However, the portion of Latino's statement about not letting motorcycles near his Platoon for fear of deadly attack was lined out. This suggests that somebody on behalf of the prosecution influenced this material witness to change his sworn statement, a reasonable inference that cannot be confirmed or dispelled at this time. The prosecution did not disclose or produce to the defense the facts and circumstances surrounding this important witness's change of story on one of the most critical legal and factual points in the case. Lest there be any doubt that the failure to disclose this important fact is material, the Army Court noted that days prior to the gunfight, Lorance had posted in the Platoon headquarters a sign indicating that no motorcycles would be allowed in the area of operations to support its conclusion that Lorance had altered the ROE. (Army Court decision at 3). The redacted portion of Latino's statement would have added context to the sign, and underscored the fact that Lorance's concern about motorcycles was reasonable and a continuation, not an alteration, of the already extant ROE.

(e) The Army twice refused to produce to appellate defense counsel the final, complete, and unredacted CID investigation report. To date, Lorance has not received it despite his requests and lawful entitlement to it to prepare his New Trial Petition, direct appeals, and the instant petition.

2. Further, the Article I military courts neither fully nor fairly reviewed the issued noted above, on direct appeal, to include the following:

(a) The Army Court's decision ignored entirely that the jury acquitted Lorance of the Charge that was a pillar of the prosecution's theory of proving murder and attempted murder. One

of the prosecution's theories of unlawfulness is that Lorance took it upon himself to change the ROE to authorize deadly force against motorcycles on sight. Had Lorance actually issued that statement to the Platoon during a pre-mission briefing on the morning in question, as the theory went, the foreseeable consequences of American shots fired at motorcycles would more readily prove Lorance's intent to unlawfully kill and thereby constitute murder and attempted murder. The Charge also fit into the prosecution's aggressive efforts to paint Lorance as a "bad apple" who sought to manufacture combat in search of a Combat Infantry Badge, as presented during argument before the jury and repeated by Brigadier General Berger after trial. In spite of the prosecution's efforts, the jury found Lorance not guilty of changing the ROE to engage motorcycles on sight.

However, Lorance's acquittal on this Charge was not mentioned in the Army Court's decision. The Army Court instead included facts suggesting Lorance changed the ROE despite the fact the jury rejected those facts and acquitted Lorance. The Army Court begins its decision with citation to the Standing Rule of Engagement (SROE) which, at the time, did not declare any forces hostile. Such a declaration authorizes American personnel to use deadly force on sight, rather than requiring an assessment of hostile intent or hostile actions, *e.g.* an 82nd Airborne paratrooper coming upon a Nazi soldier in France in 1944 could fire on sight rather than await the enemy to present a hostile act.

The Army Court's pointing out that no forces were declared "hostile" under the SROE is irrelevant and specious. The SROE concerns using force in self-defense in response to hostile acts. Classified Theater ROE, not the SROE, is the document that designates forces or groups or individuals "declared hostile." Thus, the Army Court cited the incorrect authority for the premise of declaring forces hostile. What is more, at all times, the parties assessed the legal challenges based on the ROE of hostile intent or hostile act. The only reason for the Army Court to discuss

the SROE and its opinion is because it fits nicely into the prosecution's theory -- which the Army Court bought wholesale -- that Lorance unilaterally changed the ROE to fire on motorcycles on sight. The Army Court's discussion of the SROE, coupled with its description of the poster Lorance placed in Platoon headquarters indicating that no motorcycles would be allowed in the area of operations, shows that the Army Court had accepted the prosecution's theory completely, and sought to advance it in its opinion.  All of this despite the fact that the jury acquitted Lorance of this charge.

(b) The Army Court ignored and omitted important evidence that Lorance's order to fire was based on Skelton's perception that the motorcycle and its three riders were a threat, that Lorance ordered the gun truck to fire based on Skelton's threat assessment, the targets were associated bombmakers and thus, lawful shots that cannot be murder or attempted murder.

(c) The Army Court failed to address the following issues regarding the prosecution's failure to provide to the Lorance defense team fingerprint and DNA evidence of the Afghan men who were targeted.

(1) The Army Court did not address Lorance's argument that the evidence was necessary to rebut the prosecution's case. In reaching the inadmissibility finding, the Army Court relied on the undisputed fact that Lorance was not aware of the fingerprint and DNA evidence when he relied on the ROE-assessment of the motorcycle threat to order additional fire. Absent from the Army Court's decision is the countervailing legal point that fingerprint and DNA evidence were relevant and admissible to rebut the prosecution's claim that the purported victims were civilian casualties.

(2) The Army Court did not address Lorance's argument that the evidence was necessary to assert a legal defense – that Lorance had a duty to protect Soldiers assigned to him.

Lorance was entitled to develop and present affirmative defenses such as self-defense, defense of others, justification, mistake of fact, or duress. Indeed, as a Platoon Leader, one of Lorance's main responsibilities was to safeguard his paratroopers. Had Lorance not given the order to fire on the motorcycle, and instead, the riders drove up and detonated hidden bombs killing or wounding American paratroopers, Lorance could have faced dereliction of duty charges.[10] The Army Court failed to consider these points as well as recognize the various tactics the defense team could have developed using the fingerprint and DNA evidence.

(3) The Army Court failed to address that the evidence that the Afghan men were suspected bombmakers would mitigate any sentence imposed. The fingerprint and DNA evidence were admissible as extenuation and mitigation or extenuation during sentencing. The Army Court did not address this point of law.

(4) The Army Court did not recognize or apply the Army Center for Lessons Learned's leading publication about how trustworthy, reliable, and commonplace the use of biometric identification is in Afghanistan. Lorance included the COMMANDER'S GUIDE TO BIOMETRICS IN AFGHANISTAN in his papers and cited it frequently attempting to convince the Army Court that exculpatory evidence from biometric searches is reliable and trustworthy because it is fingerprint and DNA evidence that courts have accepted for decades. The Army Court did not assess Lorance's claims in light of this recognized publication.

(5) The Army Court ignored that the DNA and fingerprint evidence was readily and accessible and available to the prosecution. The Army Court found that the prosecutor and investigators involved do not have to "search into the abyss of the intelligence community for the

_____

[10] For example, in December 2015, Air Force personnel near Bagram, Afghanistan allowed a motorcycle to ride into their ranks. The motorcycle was packed with hidden explosives. The rider detonated the explosives, killing six Americans. No American fired his or her weapon against what turned out to be a deadly threat.

potential existence of unspecified information." But the Army Court's finding in this regard ignored the evidence Lorance presented that, in Afghanistan, this evidence was readily available to investigators and in fact was the type of identifying information that ought to have been gathered as part of a reasonable investigation. The CID interviewed Afghan witnesses who confirmed names and identities, and the defense made a written request for criminal histories of any Afghan connected to the case. Accordingly, the information was specified by both the CID and the defense, notwithstanding the Army Court's finding that it was "unspecified information." Moreover, referring to a biometric search as an "abyss" reveals the Army Court's under-appreciation of the relative ease and accessibility of this reliable data. Lorance explained the confidence the Army has in biometric evidence by citation to a March 2015 federal technology journal. The cited journal article outlined the following:

> The Army's Program Executive Office for Enterprise Information Systems is in charge of a DOD-wide biometrics database that has been in the works for half a decade. The Automated Biometric Identification System is a central repository for biometrics data from various combatant commands and military services. The system can process as many as 30,000 daily submissions and hold as many as 18 million records, according to PEO EIS.
>
> For example, a soldier on patrol in Afghanistan uses a device known as the Biometrics Automated Toolset to collect biometrics. It's hardware, called the Secure Electronic Enrollment Kit II, automatically captures and formats fingerprints and iris and facial images, and has a keyboard for soldiers to type in biographical information about the subject. The handheld device connects to a central workstation that links up with any of the several dozen servers across Afghanistan for storing biometric data.
>
> The data is then sent to the ABIS database in West Virginia for correlation. The FBI and the departments of State and Homeland Security, among other agencies, use ABIS to identify biometrics

matches for criminal cases and people on intelligence watch-lists of suspected terrorists.[11]

The Army uses the same databases many times per day to target terrorists, kill terrorists, capture terrorists, authorize local nationals onto American installations, and for many other uses. For example, THE COMMANDER'S GUIDE TO BIOMETRICS IN AFGHANISTAN, created and published by the Army's Center for Lessons Learned, provides:

> Biometrics is a decisive battlefield capability being used with increasing intensity and success across Afghanistan. It effectively identifies insurgents, verifies local and third-country nationals accessing our bases and facilities, and links people to events. The biometric technology allows the targeting of persons of interest (POIs) more precisely and helps to provide desperately needed security for local populations. Across Afghanistan, there are normally four to five watch-list hits each day based solely on biometrics. These watch-list hits allow the identification and potential detainment of POIs who operate counter to Afghan, International Security Assistance Force (ISAF), and coalition goals. Beyond Afghanistan, biometrics enables the tracking of POIs across international borders and prevents them from entering the United States.

Lorance presented the above-mentioned authorities to the Army Court in his papers and noted that the search to confirm the victims' identities and eyewitness identities is often no more complicated than a *Google* search. Lorance's expert affiant explained the biometric search and "hit" process to the Army Court and applied the process to reach his case-specific findings. The COMMANDER'S GUIDE TO BIOMETRICS IN AFGHANISTAN describes, with the backing and authority of the Center for Army Lessons Learned, the ease and reliability of biometrics. Yet, the Army Court seems to have overlooked both. Without any supporting evidence or citation to any authority

---

[11] Sean Lyngaas, *Can the Pentagon Keep Pace with Biometrics?*, FCW (Mar. 11, 2015), https://fcw.com/Articles/2015/03/11/Can-the-Pentagon-keep-pace-on-biometrics.aspx?Page=1 (last visited Dec. 4, 2018).

– and contrary to daily operational practice – the Army Court mischaracterized biometrics and biometric databases as an "abyss."

The prosecution and associated investigators had complete access to the biometric data to verify these identities and any terrorist affiliations, and should have done so as part of a fundamentally complete investigation. Whether they did or not remains to be seen. What is undisputed, however, is that no biometric evidence was forthcoming to Lorance until his appellate defense team used the names in the CID reports to retrieve fingerprint and DNA evidence showing that bombmaking from US Army records that existed at the time of trial.

(d) The Army Court declined to tackle the most critical issue Lorance presented—a point that reasonably stood to require a new trial or a complete reversal: whether an order to fire based on ROE-compliant shots that hit insurgent bombmakers can be murder or attempted murder in a combat zone.

(e) Nor did the Army Court consider that, even if the Afghan victims were truly innocent civilians, they were casualties of war under applicable international law categorized as "collateral damage."

(f) The Army Court did not apply the correct legal standards to Lorance's New Trial Petition pursuant to Article 73, UCMJ; 10 U.S.C. § 873 (2012) and RCM 1210.

(g) The Army Court's opinion itself is a demonstration of the military courts' failure to fully and fairly review Lorance's convictions, both in terms of the evidence it recites and the evidence it omits. For instance, in its "Background" section, instead of discussing the frequent attacks and encounters with IEDs the Platoon had experienced in the months prior to the gunfight, the Army Court described aggressive behavior Lorance exhibited toward the local populace. (Army Court decision, pp. 2-3).

Likewise, the Army Court cherry-picked Skelton's testimony, the first paratrooper to fire on the approaching Afghan men. The Army Court dutifully noted Skelton's testimony that Lorance had ordered him (Skelton) to fire on the motorcyclists, but ignored Skelton's testimony that the "first thought" he had when he saw the motorcyclists was that "it could be a drive-by shooting; it could be a drive-by grenade throw; it could be a vehicle-borne IED." (R. at 537). The Army Court's decision is, at bottom, a piece of appellate advocacy, written by former Army prosecutors to sustain decisions made by current Army prosecutors to secure convictions that ought never to have occurred.

The Army Court seemingly sought to create a false narrative of how biometrics work in Afghanistan by calling the proven technology "an abyss," suggesting fingerprint and DNA evidence is something more complicated and mysterious than the reality. Demonstrating how reliable and trustworthy fingerprint and DNA evidence is within the Federal government in the context of accurately identifying those responsible for making IEDs are the Director of the FBI's public comments on October 26, 2018. As he stood with the Attorney General of the United States at a press conference to discuss how the FBI worked with other agencies to arrest the Florida bombmaker who mailed bombs to prominent public figures, Cesar Sayoc, the Director stated, "[w]e can confirm that 13 IEDs were sent to various individuals across the country," and based on investigation, agents:

> Uncovered a latent fingerprint from one of the envelopes containing an IED that had been sent to Congresswoman Maxine Waters. We have confirmed this fingerprint is that of Cesar Sayoc. There is also a possible DNA connection between samples collected from pieces of two different IEDs, mailed in separate envelopes, and a sample previously collected from Sayoc in connection with an earlier arrest in Florida.

FBI Director Christopher Wray's October 26, 2018, Press Release.[12]

The fingerprint and DNA technology used daily in Afghanistan to identify those responsible for making IEDs is the same type and quality that the FBI used in the Cesar Sayoc case, and at times, directly involves the FBI, *e.g. Combined Joint Task Force Palladin*. Far from the Army Court's characterization of an "abyss," the methodology is proven, accepted, and in widespread use.

3. To prevail on a *Brady* claim, a petitioner must show: "(1) the government suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material." *United States v. Reese*, 745 F.3d 1075, 1083 (10th Cir. 2014). Evidence is material if "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469 (2009). "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles*, 514 U.S. at 434. Instead, material evidence is that which "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*. at 435. The Court evaluates materiality in the context of the entire record. *Moore v. Gibson*, 195 F.3d 1152, 1182 (10th Cir. 1999).

Application of these principles reveals that the Army Court took an improperly narrow view—one contrary to established precedent—of the impact the suppressed evidence would have had on the trial and sentencing. These points demonstrate that Lorance's appeal and New Trial Petition were neither fully nor fairly considered and that his Fifth Amendment protections were inadequately safeguarded by Article I military courts.

---

[12] FBI National Press Office, *FBI Director Christopher Wray's Remarks Regarding Arrest of Cesar Sayoc in Suspicious Package Investigation, available at*: https://www.fbi.gov/news/pressrel/press-releases/fbi-director-christopher-wrays-remarks-regarding-arrest-of-cesar-sayoc-in-suspicious-package-investigation

## B. GROUND TWO - SIXTH AMENDMENT INEFFECTIVE ASSISTANCE OF COUNSEL

### LAW

In *Strickland*, 466 U.S. at 686, the Supreme Court found that the Sixth Amendment entitles criminal defendants to the "effective assistance of counsel"— that is, representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms." To prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate: (1) that his counsel's performance was deficient and (2) that this deficiency resulted in prejudice. *United States v. Green*, 68 M.J. 360, 361-62 (C.A.A.F. 2010).

In judging the reasonableness of counsel's challenged conduct, the judge will look to the facts of the particular case, viewed as of the time of counsel's conduct. *Strickland*, 466 U.S. at 690. Furthermore, the court will consider the totality of the circumstances, bearing in mind "counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work . . . [and] recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*.

"At the heart of an effective defense is an adequate investigation. Without sufficient investigation, a defense attorney, no matter how intelligent or persuasive in court, renders deficient performance and jeopardizes his client's defense." *Richter v. Hickman*, 578 F.3d 944, 946 (9th Cir. 2009); *United States v. Scott*, 24 M.J. 186, 192 (C.M.A. 1987) (finding ineffective assistance of counsel when defense counsel failed to conduct adequate pretrial investigation). "In many cases, "[p]retrial investigation is . . . the most critical stage of a lawyer's preparation." *House v. Balkcom*, 725 F.2d 608, 618 (11th Cir. 1984). Stated differently, where counsel did not possess the investigatory foundation to make informed tactical decisions, he is not entitled to judicial deference to his tactical trial decisions. In *Balkcom*, a habeas petitioner claimed that there was no

investigation, no interviewing of witnesses, no preparation of a defense, no discovery, no visiting of the crime scene, and no trial preparation. The court found that knowledge of the crime scene may have helped defense counsel in the preparation of the defense, and certainly would have informed the direct examination of the Petitioner himself at trial. *See also Harris v. Reed*, 894 F.2d 871 (7th Cir. 1990); *United States v. Gray*, 878 F.2d 702 (3rd Cir. 1989); *Wade v. Armontrout*, 798 F.2d 304 (8th Cir. 1986).

In *Hargrave-Thomas v. Yukins*, 236 F.Supp.2d 750 (E.D. Mich. 2002), defense counsel admitted that he did not interview any witnesses or conduct any other type of investigation before Petitioner's trial for first degree murder. Similarly, in *Soffar v. Dretke*, 368 F.3d 441 (5th Cir. 2004), defense counsel failed to interview the only known eyewitness to a felony murder. In *Turner v. Duncan*, counsel delivered only minimal efforts to prepare. 158 F.3d 449 (9th Cir. 1998).

In *Kimmelman v. Morrison*, 477 U.S. 365 (1986), the Supreme Court held that counsel's failure to conduct discovery on the mistaken belief that the prosecution had an obligation to turn over inculpatory evidence resulted in deficient performance. Likewise, a habeas petition was granted where defense counsel was aware of police reports where witnesses made comments favorable to the accused, as the names and addresses of the witnesses were available to defense counsel, yet he made no effort to locate or interview them. *Sullivan v. Fairman*, 819 F.2d 1382 (7th Cir. 1987).

Specific grounds

Lorance relies on the following undisputed evidence in support of his claim that counsel did not investigate or prepare sufficiently to make informed tactical decisions at trial, and that his performance was deficient and caused actual prejudice to Lorance. Counsel did not:

(1) draft, file, or argue any pretrial motions to suppress or *in limine*;

62

(2) seek or secure consulting or testifying expert on biometrics, the ROE, or use of force;

(3) interview the American witnesses against Lorance, including the CID agents who investigated the case;

(4) interview the attempted murder victim, Karimullah, who CID interviewed;

(5) interview the eyewitness shot in the arm, Rahim, who CID interviewed;

(6) interview Ahad, who identified the motorcyclists, and knew them to be associates of bombmakers, based on his CID interview;

(7) Interview any of the ANA soldiers given reports that the ANA may have fired first on the motorcycle, who provided statements to CID;

(8) Move to compel production of fingerprint and DNA evidence of bombmaking;

(9) Interview Dominic Latino about his time as Platoon Leader and his lined-out sworn statement that he would never let a motorcycle near his Platoon, who CID interviewed;

(10) Secure and use the Army's SIGACT report noting that Lorance's Platoon was being scouted for an enemy attack or ambush and that one insurgent was confirmed killed;

(11) Seek to have Rahim's bloody clothing seized by the CID after he was shot in the arm, analyzed in order to use any DNA to determine whether Rahim was a terrorist bombmaker;

(12) Prepare or present a defense case-in-chief or a sentencing case;

(13) Develop or present the recognized affirmative defenses of justification, self-defense, defense of others, duress, mistake of fact, or obedience to lawful orders;

(14) Cross-examine witnesses on the fact that they received grants of immunity for murder and were ordered to cooperate;

(15) Accept the trial judge's invitation to issue jury instructions on affirmative defenses, immunity for testifying witnesses, or lesser-included offenses; or

(16) Prepare Lorance to testify in his own defense.

Accordingly, counsel did not possess the investigatory foundation to make informed tactical decisions at trial, largely because he failed to investigate "all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." These undisputed facts were before the Army Court, which decided that counsel's performance was neither deficient nor prejudicial to Lorance.

Absent from the Army Court's opinion, though, is an application of the law to counsel's failures discussed above or the cumulative effects of these deficiencies which suggest that counsel made serious errors that deprived Lorance of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687. This absence suggests that Lorance's Sixth Amendment ineffective assistance of counsel claim was neither fully nor fairly reviewed, as case law evaluating similar facts demonstrates that Lorance was deprived of this constitutional right to effective assistance of counsel during findings and sentencing. *See, e.g., Holmes v. McKune*, 59 Fed. Appx. 239, 2003 U.S. App. LEXIS 1769 (10th Cir. Jan. 31, 2003) (counsel's failure to investigate and present defense ineffective); *Cargle v. Mullin*, 317 F.3d 1196 (10th Cr. 2003) (counsel failed to interview or call witnesses, agreed to forego impeachment of immunized coperpetrator); *Fisher v. Gibson*, 282 F.3d 1283 (10th Cir. 2002) (counsel ineffective for failing to conduct pretrial investigation and failing to advance defense theory at trial); *Wiggins v. Smith*, 539 U.S. 510 (2003) (defense counsel's limited investigation of mitigating evidence violated petitioner's right to effective counsel during sentencing); *Williams v. Taylor*, 529 U.S. 362 (2000) (counsel did not begin to prepare for the sentencing phase until a week before the trial and failed to uncover mitigating records); *Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012) (counsel presented woefully

inadequate mitigation); *Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007) (counsel's failure to investigate and obtain readily available evidence in mitigation).

C. Ground three – Due Process - jury instructions on affirmative defenses not given

Law

Without question, a defendant is entitled to an instruction on a defense that is supported by the evidence and the law. *United States v. Sparks*, 791 F.3d 1188, 1193 (10th Cir. 2015), citing *United States v. Haney*, 318 F.3d 1161, 1163 (10th Cir. 2003). More specifically, a defendant is entitled to an instruction on an affirmative defense if he can point to evidence supporting each element of that defense. *United States v. Al-Rekabi*, 454 F.3d 1113, 1121-22 (10th Cir. 2006). In habeas review cases, the district court reviews the failure of a trial court to issue an instruction *sua sponte* for the denial of fundamental fairness and due process. *Spears v. Mullin*, 343 F.3d 1215, 1244 (10th Cir. 2003).

Specific grounds

The evidence at trial reasonably raised the following recognized affirmative defenses, for which the trial judge provided no instructions to the jury: 1) Justification, "[a] death, injury, or other act caused or done in proper performance of a legal duty is justified and not unlawful"; 2) Obedience to Orders, "[i]t is a defense to any offense that the accused was acting pursuant to orders"; 3) Duress, [i]t is a defense "that the accused's participation in the offense was caused by a reasonable apprehension that the accused or another innocent person would be immediately killed"; and 4) Ignorance or mistake of fact, [i]t is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would be not guilty of the offense." *See* RCM 916.

Lorance, pursuant to the orders of his commanders, led his Platoon into an area heavily populated by military-aged men, often in Afghan civilian attire, who were hostile to U.S. forces and had recently and frequently attempted to kill American Soldiers. The undisputed evidence at trial established that Lorance learned that one of his Soldiers fired at approaching military-aged men in reaction to a perceived threat; and Lorance ordered the gun truck to fire in order to protect his Platoon. These facts raise give rise to each and every one of these affirmative defenses, and the trial court's failure to instruct the jury as to these defenses left them rudderless, resulting in the denial of due process and fundamental fairness to Lorance.

By analogy – and by relevant United States Supreme Court caselaw – if a law enforcement officer in the United States made a self-defense decision based on his reasonably perceiving a threat, he could not even be civilly liable, much less criminally responsible, for a decision made in split-seconds under conditions that were "tense, uncertain and rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 397 (1989). And that officer's subjective intent is irrelevant so long as the underlying action was reasonable. *Id*. at 398. To parse out shot-by-shot an engagement that lasted mere seconds flies in the face of the clear guidance of *Graham* and its progeny.

D. GROUND FOUR – LEGAL AND FACTUAL INSUFFICIENCY

LAW

The Army Court was empowered to affirm only those findings of guilt that it finds, upon appellate review, to be correct in law and fact. Article 66(c), UCMJ; 10 U.S.C. § 867 (2016). The applicable test for factual sufficiency is whether, after weighing the evidence of record and making allowances for not having personally observed the witnesses, the court is convinced of appellant's guilt beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

The applicable test for legal sufficiency is whether, considering the evidence in the light

most favorable to the government, a rational fact finder could have found all the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318-19 (1979).

SPECIFIC GROUNDS

The military appellate courts never addressed head-on the central constitutional basis for these convictions: that Lorance led his Platoon into a known enemy stronghold, and one of the men he was charged with leading and protecting saw a fast-approaching motorcycle bearing down on them, perceived a threat, and fired his weapon. Lorance, who was responsible for protecting the men and believed their lives to be in danger, ordered the gun truck to engage. Two of the three men approaching the Platoon were killed, and one escaped. No rational fact-finder could find that the split-second decision of this leader, which occurred in a volatile, unfolding, complex, ambiguous and unforgiving combat environment, could have amounted to murder or attempted murder. This is especially true given the fact that the jury rejected the prosecution's theory that, prior to the patrol, Lorance had unilaterally changed the ROE and instructed his Platoon to fire at any motorcycle on sight. The military courts never addressed these facts; if they had, they would not have been able to sustain the convictions and the sentence.

IX. PRAYER FOR RELIEF

WHEREFORE, Petitioner Clint A. Lorance respectfully prays that the Court:

1)  Award the writ, reverse, overturn, and vacate his convictions and sentence in their entirety with prejudice;

2) Order Respondents to immediately and forthwith restore all pay, rank, benefits, entitlements, and privileges as have been unlawfully denied by Respondents of said prosecution, conviction, sentence, and lack of full and fair review;

67

3) Order Respondents to immediately, completely, and expeditiously make all such changes to all of Lorance's official and unofficial records in Respondents' care, custody, and/or control in order to fully effectuate, enable, and carry out the Order of this Court;

4) Award Lorance costs and attorneys' fees; and

5) Grant such other relief as may be appropriate and to dispose of this matter as law and justice require, 28 U.S.C. § 2243; or alternatively,

6) Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts (Habeas Rules), order the Respondents to produce the transcript of trial, the transcript of all post-conviction hearings (before the Army Court and the CAAF), other relevant records in the case, file its answer, motion, or other response, and afford Petitioner the opportunity to reply to the Respondents' answer;

7) Order discovery on behalf of Petitioner pursuant to Habeas Rule 6;

8) Order expansion of the record pursuant to Habeas Rule 7;

9) Conduct a hearing at which evidence may be offered concerning the factual allegations of the Petition; and

10) Grant such other relief as may be appropriate and to dispose of this matter as law and justice require. 28 U.S.C. § 2243.

Respectfully submitted,

Clint Allen Lorance

By:    /s/ Christopher M. Joseph
        *Attorneys for Petitioner*

John N. Maher *pro hac vice*
Illinois ARDC 6237599
District of Columbia 489313
Kevin Mikolashek
David Bolgiano
Don Brown
MAHER LEGAL SERVICES PC
7 East Main Street, Number 1053
St. Charles, Illinois 60174
Tel: (708) 468-8155
johnmaher@maherlegalservices.com

Christopher Joseph, #19778
Carrie Parker, #24998
Diane Bellquist, #20969
JOSEPH, HOLLANDER & CRAFT LLC
1508 SW Topeka Blvd.
Topeka, KS 66612-1887
(785) 234-3272 Main
(785) 234-3610 Fax
cjoseph@josephhollander.com

## VERIFICATION

Pursuant to 28 U.S.C. § 2242, Petitioner Clint A. Lorance's application for a Writ of Habeas Corpus is in writing and signed and verified by his attorneys acting on his behalf.

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2019, I electronically transmitted Petitioner Clint A. Lorance's Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241, to the Clerk's Office, forwarding to a judge pursuant to the Court's assignment procedure per Habeas Rule 4, and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants: United States Attorney for the District of Kansas.

By: /s/ Christopher M. Joseph